UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| MACKENZIE FORREST, | : | |
| | : | |
| Plaintiff, | : | ____ CV _____ |
| | : | |
| -against- | : | |
| | : | **VERIFIED COMPLAINT** |
| THE TRUSTEES OF COLUMBIA | : | |
| UNIVERSITY IN THE CITY OF NEW YORK, | : | Jury trial demanded. |
| MINOUCHE SHAFIK, ANDRE IVANOFF, | : | |
| and ELIZABETH CREEL, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------x

Plaintiff Mackenzie Forrest ("Macky" or "Plaintiff") avers for her complaint against The Trustees Of Columbia University In The City Of New York ("Columbia"), Minouche Shafik, Andre Ivanoff, and Elizabeth Creel, upon knowledge with respect to her own acts and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit is the story of Macky, a straight-A Jewish[1] student at the Columbia School of Social Work ("CSSW"), who was forced out of a specialized academic program simply because she is Jewish.

2.      For many years, Columbia has disgracefully tolerated a culture of antisemitism, where frequent verbal and physical manifestations of Jew-hatred have fostered a hostile environment for Jewish students on campus.

---

[1]      "Jewish" is not merely a religious description, it also includes Macky's "shared ancestry" and "ethnicity," categories which are protected under, *inter alia*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.  Discrimination against Macky based on her religion and Jewish creed are prohibited by New York Executive Law (Human Rights) § 296 *et seq*. and New York Civil Rights Law § 40-c.

3.     Macky's initial encounter with faculty and administration antisemitism occurred when her request for Sabbath observance accommodations within CSSW's Dialectical Behavioral Therapy ("DBT") Program was first met with outright resistance and then only begrudgingly and ungraciously "accommodated" by a resentful faculty and administration.

4.     Antisemitism among Columbia faculty, administration, and students reached unprecedented heights following the unspeakable horrors of October 7, 2023, and the brutal attack on Israeli civilians by Hamas, a State Department designated terrorist organization.

5.     In the attack, Hamas murdered approximately 1,400 innocent Israeli civilians and committed atrocities, such as beheadings, burnings, rapes, and mutilations.  Victims included babies. Hundreds more were kidnapped.  Student groups and professors at Columbia celebrated the "awesome" act of "resistance."

6.     This explosion of antisemitism created a perilous environment for Jewish students, including Macky, threatening their emotional and physical safety.

7.     Macky reported the dangerous and hostile environment to Columbia administrators who did little or nothing to address it.

8.     Macky pleaded with the Columbia administration to provide her with a reasonable accommodation to protect her from the threats she faced as a Jewish student on campus, but her requests were rejected.

9.     Faculty and administration grew increasingly intolerant of Macky's reports of a hostile environment and her requests for accommodation.  In a clear act of retaliation, they began fabricating allegations of her failure to meet program standards to create pretexts under which they could force her out of the DBT program.  Their relentless pursuit was successful, and Macky was forced out of the program (but not out of CSSW altogether).

10.     Columbia violated federal and state antidiscrimination laws that prohibit discrimination and retaliation against Jewish persons in at least three ways: (i) ignoring Macky's reasonable fears that she faced a hostile antisemitic environment on campus, (ii) rejecting her request for a reasonable accommodation to mitigate the risk of harm she faced as a Jewish person, and (iii) retaliating against her for making the report and requesting the accommodation.

11.     Macky seeks injunctive relief and money damages based on federal, state, and common law claims[2] arising out of defendants' unlawful discrimination and retaliation against her because of her status as a Jew,[3] specifically an Orthodox Jew and sabbath observer.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq*.).  This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

13.     This Court has personal jurisdiction over the defendants because each of them is based and operates or works in New York, New York and because the acts complained of were committed by the defendants in this District.

14.     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and where Columbia is located.

---

[2]     Title VI of the Civil Rights Act of 1964, 42 U.S.C.§ 2000d *et seq*.; New York Executive Law (Human Rights) § 296 *et seq*.; New York Civil Rights Law § 40-c; New York General Business Law §§ 349, 350; and breach of contract.
[3]     The U.S. Education Department, Office of Civil Rights, refers to antisemitism as a type of "National Origin Discrimination Involving Religion" or "discrimination involving shared ancestry."

**THE PARTIES**

15.     Plaintiff Mackenzie Forrest is an individual.

16.     Defendant Columbia is a private, not-for-profit, tax-exempt educational institution, located in New York, New York, organized and existing under the laws of the State of New York. It operates, amongst other schools, CSSW.

17.     At all relevant times, Columbia was and continues to be a recipient of federal funding, making it subject to Title VI.

18.     Columbia is an "educational institution" within the meaning of the New York State Human Rights Law.

19.     Defendant Minouche Shafik is an individual who is or was at all relevant times employed by Columbia or CSSW.

20.     Defendant Andre Ivanoff is an individual who is or was at all relevant times employed by Columbia or CSSW.

21.     Defendant Elizabeth Creel is an individual who is or was at all relevant times employed by Columbia or CSSW.

**FACTS**

22.     Macky is in her second year of her two-year graduate program at CSSW for a Masters of Social Work ("MSW") degree.

23.     Macky was pursuing an MSW degree that included study in a one-of-a-kind program at CSSW called the Dialectical Behavior Therapy Training Program (the "DBT Program").[4]

---

[4]     Unlike typical undergraduate studies at college, the Master's program at CSSW does not have a "major" and a "minor" area of study, but the DBT Program could be thought of as being similar to a "minor."

24.     Macky began attending CSSW in August 2022 and was a student in CSSW's DBT Program from May 2023 through December 14, 2023.

25.     Prior to being forced out in Fall 2023, Macky was in the one-year DBT Program that formed a part of her second year of MSW studies.

26.     She is a straight-A student.

## MACKY'S EXPERIENCE WITH ANTISEMITISM AT COLUMBIA

27.     From the time she was accepted into the DBT Program in Spring 2023, Macky was subjected to antisemitism.  Indeed, when she informed the director of the DBT Program, Andre Ivanoff, Ph.D. ("Dr. Ivanoff"). that she was a Sabbath observer, Dr. Ivanov told Macky that was "a problem."

28.     The antisemitism exploded on October 7, 2023, in the second year of her MSW studies (and the first year of her one-year DBT Program), when Hamas, a group designated by the United States Government as a Foreign Terrorist Organization, launched a massive terrorist attack against Israeli citizens.

29.     The events in Israel and Gaza in October 2023 unleashed an explosion of antisemitism on the Columbia campus, rendering it, at least temporarily, unsafe for Jewish students.

30.     From campus protests calling for the genocide of Jews, including some that resulted in physical harm to Jewish students, to the posting of antisemitic manifestos in the halls of CSSW where Macky attended classes, Columbia became a "war zone" for Macky simply because she is a Jew.

31.     In the face of this intimidation and violence, other than issuing empty statements of "condemnation," Columbia did little or nothing to protect Macky or other Jewish students.

32.     Macky, concerned for her personal safety, requested that she be permitted to continue in the DBT Program remotely, via Zoom or similar platform until such time as it was safe for her to return to campus.  Her request was denied because defendants did not consider her concerns for her personal safety to be worthy of accommodation.

33.     Defendants then retaliated against Macky for reporting that the campus was unsafe and for requesting an accommodation.  Macky was told for the first time that she was not meeting the requirements and at risk of failing her field placement portion (discussed below) of the DBT Program.

34.     Macky was given the "choice" of staying in the DBT Program and failing which would result in her expulsion from the DBT Program, or "choosing" to drop the DBT Program "voluntarily."

35.     Faced with the totally fabricated threat of receiving a failing grade, Macky "chose" to leave the DBT Program.

**MACKY'S RELIGIOUS AND EDUCATIONAL BACKGROUND**

36.     Macky was born and raised in Florida.

37.     Until she was forced out of CSSW's DBT Program, she lived in New York.

38.     She is 23 years old.

39.     She is a modern Orthodox Jew, and her Judaism is a fundamental part of her identity.

40.     Macky leads her life according to the tenets of halacha – or Jewish law – as practiced by Orthodox Jews worldwide.  For example, Macky keeps kosher and thus adheres to the dietary strictures followed by Orthodox Jews.  As another example, Macky is sabbath observant and refrains from performing activities which are prohibited by halacha on the Jewish sabbath (*i.e.*, Saturdays).

41.     In May 2022, Macky graduated with honors from Babson with a Bachelor of Science in Business, with concentrations in Finance and Environmental Sustainability. As a result of her excellent grades, she had a choice of schools she could attend for graduate school.

## MACKY APPLIES TO THE CSSW PROGRAM

42.     Macky chose to attend CSSW precisely because it offered the DBT Program, a specialized program which runs from May of a social work student's first year through graduation.

43.     The DBT Program is only open to a limited number of CSSW students and requires students to apply and be accepted to the program through a competitive application process run by the director of the DBT Program, Dr. Ivanoff.

44.     During the interview process—indeed, during the very phone call during which Dr. Ivanoff called her to let her know that she had been accepted into the program – Macky informed Dr. Ivanoff that she was a sabbath-observer.  Macky did this, as she had done in past similar circumstances with others, to be fully transparent with Dr. Ivanoff and to let Dr. Ivanoff know that she had every intention of doing what was required to succeed in the DBT Program, despite being unavailable from sundown on Friday through sundown on Saturday.

45.     Dr. Ivanoff's initial response stunned Macky.  Upon hearing that Macky was a sabbath-observer, Dr. Ivanoff responded: "**that is a problem**."

46.     Apparently realizing the inappropriateness of her response, Dr. Ivanoff attempted to correct herself shortly thereafter and said: "well, not a problem, but an issue."

47.     This was just the first instance in which Macky's sabbath observance was identified as a "problem" or "issue" for her in connection with the DBT Program.  Over time, the antisemitism Macky experienced became more frequent and pernicious.

48.     As discussed in more detail below, other examples include Dr. Ivanoff: (i) telling Macky "I think you need a weekend long dispensation from your rabbi to attend" a seminar that took place on the Jewish sabbath and (ii) admonishing Macky for missing a class the day after a Jewish holiday because she was traveling back from Florida after spending the holiday with her family – even though each CSSW student is allowed a certain number of absences per semester and Macky never exceeded her allotment.

**<u>MACKY MATRICULATES AT CSSW</u>**

49.     Macky matriculated at CSSW in the Fall of 2022.

50.     The single most important reason Macky chose to attend CSSW – rather than attend a different graduate program or start her working career – was the DBT Program.

51.     CSSW's DBT Program is unique.  According to CSSW's website, the "program is, to date, the first and only DBT training program within a School of Social Work." https://socialwork.columbia.edu/faculty-research/research-centers-programs/dbt/ (website last visited on 1/172024).

52.     Because Macky aspires to be a DBT therapist, she specifically chose to obtain her Masters in Social Work at CSSW.

53.     As detailed on the CSSW website: "Students interested in becoming DBT Interns should register their interest early by attending informational sessions held in the fall of their first year at CSSW."  https://blogs.cuit.columbia.edu/dbt/training/.

54.      Following this advice, Macky attended the informational session concerning the DBT Program shortly after arriving on campus in the Fall of 2022.

55.     After learning more about the DBT Program, Macky's desire to apply only increased and she formally applied to the DBT Program in December 2022.

56.     It is a competitive application process and only eighteen students were admitted into the DBT Program.

57.     As described on the CSSW website, the application process:

> includes a statement of personal interest, references and two interviews. Evaluations are based on academic preparation, prior clinical experience with cognitive-behavioral interventions, and research interest.

https://blogs.cuit.columbia.edu/dbt/training/  (website last visited on 1/17/2024).

58.     Macky's application was so strong that she was admitted into the DBT Program without the need for a second-round interview. Dr. Ivanoff, the director of the DBT Program, called Macky in February 2023 to let her know that she was accepted and to personally invite her to join the DBT Program.

59.     Macky accepted the invitation to join the DBT Program within two days of receiving it.

60.     As stated above, immediately upon Macky's acceptance to the DBT Program, Macky informed Dr. Ivanoff that she was a sabbath-observer and was told "**that is a problem**." or, at least "an issue."

61.     It is very possible that Columbia would not have accepted Macky into the DBT Program had Macky told Dr. Ivanoff that she was a sabbath-observer before Dr. Ivanoff extended the offer of acceptance.

62.     The DBT Program began in May 2023 and, as part of the program, Macky enrolled in two summer classes at CSSW.

63.     As with all her prior classes at CSSW, Macky maintained a perfect grade point average in these two summer classes.

64.    In the Fall of 2023, Macky enrolled in Fall semester classes specifically required for DBT Program students.

65.    Macky's Fall classes met once a week at CSSW.

## MACKY'S INTERNSHIP AT COUNSELING CENTER GROUP

66.    In addition to her coursework, Macky – like all DBT Program students – was placed in a field-based DBT internship to gain further experience working with DBT practitioners and patients during the Fall 2023 semester.

67.    Macky – together with two other students in the DBT Program – was placed at the Counseling Center Group ("CCG") for her internship.

68.    Macky's orientation and training at CCG took place exclusively remotely – via Zoom and other similar platforms.

69.    In fact, the only time that the DBT Program students were required to be present in one of CCG's offices was if they were providing counseling to a client who chose to be seen in-person rather than via Zoom.

70.     In late September, Macky met with CCG's Clinical Director, Alexis Santiago-Autar ("Ms. Santiago-Autar"), to go over CCG's expectations of Macky and the role and responsibilities Macky would have as an intern.

71.    In advance of this meeting, Macky prepared a document outlining what she understood her role and responsibilities to be at CCG.  Macky went over this document with Ms. Santiago-Autar during their meeting and Ms. Santiago-Autar confirmed to Macky that it accurately reflected what was expected of Macky.

72.    Macky was presented her first client at CCG in September 2023. The client preferred to meet over Zoom, rather than in-person and Macky agreed to work with her in this manner.

73.    In addition to seeing her client, Macky was also tasked with presenting the case to a consult team and co-facilitating a multi-family skills group.

74.    Macky and Ms. Santiago-Autar had weekly meetings to discuss her client, as well as the other work Macky was performing at CCG.

75.    Ms. Santiago-Autar never raised any concerns about Macky's performance during these weekly meetings.  To the contrary, she regularly complemented Macky on the work she was doing and her general attitude and professionalism.

76.    Similarly, Macky was also excelling in her Fall 2023 coursework at CSSW.  None of her professors ever raised any concerns about her performance or workload.  To the contrary, Macky was on track to maintain the perfect grade point average she achieved in her first-year courses.

**DR. IVANOFF TELLS MACKY SHE NEEDS TO GET A
"DISPENSATION" FROM A RABBI FOR HER RELIGIOUS OBSERVANCE**

77.    During the Fall semester, the DBT Program holds a two-and-a-half-day workshop seminar in suicide risk assessment and management.  Because it occurs over a weekend, this training is referred to as "Suicide Weekend."

78.    For the Fall 2023 semester, Suicide Weekend was scheduled for October 27th through October 29th.

79.    As discussed above, Macky informed Dr. Ivanoff of her sabbath observance immediately upon her acceptance into the DBT Program.

80.    She also had multiple conversations with Dr. Ivanoff about not being able to attend those portions of Suicide Weekend that take place between sundown on Friday and sundown on Saturday.

81.     Notwithstanding these conversations, as the date for Suicide Weekend drew closer, Dr. Ivanoff began pressuring Macky to compromise on her religious observance and attend Suicide Weekend in full.

82.     Specifically, in a text sent on September 20, 2023, Dr. Ivanoff said:

> I really think you need to talk to both your rabbi in Florida and your advisor at Columbia.  When you signed up for this program you were aware of suicide weekend which is a Friday night and all day Saturday and Sunday. I assume your religious observances have not changed since that time –am I wrong?
>
> I am unclear what sort of accommodation you thought might be available for missing this experiential 2 ½ day workshop but I can tell you it is integral to DBT training.  I think you need a weekend long dispensation from your rabbi to attend this educational work and to participate fully including using computer media etc. etc. to complete this important work. . .

83.     On September 26, 2023, Dr. Ivanoff sent Macky another text stating:

> Hi Macky – I'm wondering what you've worked out with advising, your Rabbi & field instructor about your participation in suicide weekend?

84.     In response to these texts, Macky reiterated that, as a sabbath-observant Orthodox Jew, she was unable to attend the portions of Suicide Weekend that were taking place over the sabbath, but that she was "able to fully attend and participate on Sunday."

85.     Ultimately, rather than allow Macky to participate in the non-sabbath portions of Suicide Weekend, Dr. Ivanoff reluctantly told her that she should not come to Suicide Weekend at all and that instead Dr. Ivanoff would create an alternative assignment for Macky.

86.     Macky's interactions with Dr. Ivanoff concerning Suicide Weekend – specifically, Dr. Ivanoff's repeated inquires asking Macky to compromise on her religious beliefs to attend Suicide Weekend – demonstrated to Macky that her religious observance was indeed a "problem" or "issue," just as Dr. Ivanoff had indicated during their first conversation upon Macky's acceptance into the DBT Program.

87.     In fact, Macky's request for an accommodation with respect to Suicide Weekend, together with her request for an accommodation arising out of her legitimate safety fears in the wake of the October 7th terrorist attack (discussed below), caused CSSW to retaliate against her by forcing her out of the DBT Program entirely.

**THE OCTOBER 7TH HAMAS ATTACK AND THE**
**EXPLOSION OF OPEN ANTI-SEMITISM AT COLUMBIA**

88.     In addition to the hostile environment Macky experienced as a result of her interaction concerning the "problem" or "issue" of her Jewish sabbath observance, Macky was subject to a virulently hostile environment on campus.

89.     Shockingly, in the wake of the October 7, 2023 massacre perpetrated by Hamas in Israel, many students – including CSSW students -- and faculty members at Columbia have proudly and enthusiastically endorsed Hamas and justified the terrorist group's efforts to destroy Israel and exterminate the Jewish people.

90.     These and other expressions of support for Hamas manifested themselves in mass, and sometimes violent, protests at Columbia.  These protests have occurred frequently, if not daily on campus since the October 7 terrorist attack.

91.     The pro-Hamas and anti-Israel/antisemitic protests continue at Columbia today.

92.     This is the context in which the defendants refused to make reasonable accommodations to address Macky's realistic fear for her personal safety on the Columbia campus and then forced her out of the DBT Program.

93.     Rather than denouncing the acts of Hamas as horrific and inhumane, numerous students and faculty at Columbia and CSSW endorse the Hamas massacre and continue to proudly demonstrate their support for Hamas and its genocidal war against Israel and the Jewish people.

94.     Columbia's Administration has done little or nothing to protect its Jewish community.

95.     Jews who dared speak up in support of Israel and the hostages held by Hamas were threatened with physical harm and subjected to verbal abuse.  These were not empty threats.  For example, one pro-Israel supporter was attacked with a broom and suffered a broken bone by Hamas supporters on Columbia's campus.

96.     On October 18, 2023, Columbia's President, defendant Minouche Shafik, sent an e-mail titled "Upholding Our Values."   The e-mail acknowledged the obvious safety concerns students felt from the protests on Columbia's campus and stated, in part:

> Many of our students, faculty, staff, and colleagues are suffering great distress over the terror attacks on Israel and the humanitarian crisis in Gaza. . . .
> Our day-to-day duty of care for the security and well-being of our students, faculty, and staff is paramount. Some students may need special accommodations as they cope with fear and grief, and those arrangements can be made through advisors or deans of students.
> We know that the atmosphere on campus is extremely charged, and some of you have expressed concern about your personal security. Let me reassure you that the University will take all available steps to help you. We have increased public safety presence across all of our campuses. We are also working with outside security firms for additional support and are in regular contact with the New York City Police Department. We have added resources to our existing hotline and escort service and I encourage anyone who is concerned about their safety to use it.
> Debate, advocacy, and protest are essential ways for students to address and process political and social turmoil, and we are duty-bound to ensure they can gather and express themselves. We will continue to observe all necessary safeguards around these activities and will work closely with students to ensure that they adhere to our event guidelines.
> Unfortunately, some are using this moment to spread antisemitism, Islamophobia, bigotry against Palestinians and Israelis, and various other forms of hate. I have been disheartened that some of this abhorrent rhetoric is coming from members of our community, including members of our faculty and staff. Especially at a time of pain and anger, we must avoid language that vilifies, threatens, or stereotypes entire groups of people. It is antithetical to Columbia's values and can lead to acts of harassment or violence. When this type of speech is unlawful or violates University rules, it will not be tolerated. . .

97.     Unfortunately, this e-mail was nothing more than an empty gesture.  Shafik caused little if anything to be done to protect the safety and wellbeing of Columbia's Jewish students and harassment continued unfettered on campus.

98.     The "special accommodations" consisted of nothing more than extra time on exams.

99.     The mob-like protests, sit-ins, and demonstrations continued with ferocity.

100.    For example, less than a week after the October 7th massacre, hundreds of students gathered on Columbia's quad for a rally organized by Students for Justice in Palestine and Jewish Voices for Peace – organizations, which despite their Orwellian names, attempted to justify the Hamas massacre.  These protests continued regularly over the following months.

101.    Other examples include the assault of an Israeli student hanging up posters of those taken hostage by Hamas and swastikas drawn in Columbia buildings.

102.    In light of these, and other similar incidents, it is no wonder that Shai Davidai, an assistant professor of management at Columbia Business School wrote his now well publicized piece titled: "I'm a Jewish Columbia professor.  I wouldn't allow my children to go here now." www.cnn.com/2023/11/03/opinions/israel-cornell-jewish-threats-columbia-hamas-davidai/index.html  (website last visited on February 12, 2024).

103.    In his piece, Professor Davidai states:

Were they older, I would have loved for my children to attend an incredible institution like Columbia. But not now, not under this leadership. I would be too worried for their safety. The differences between the student organizations' chant of "from the river to the sea" and the Nazi chant of "Germany for Germans" are mere semantics. The antisemitic sentiment is the same.

It is not just these chants that keep me up at night. It is the antisemitic violence that inevitably follows when university leaders are willing to look the other way.

There is the Israeli student who was physically attacked at my workplace, Columbia University, while hanging posters of the kidnapped babies in Gaza, the Jewish students here who have been spat on, cursed at and received death threats.

104.   Professor Davidai may be best known for a video that went viral in which he accused Columbia's President of being a "coward" because she was unwilling to speak out against the blatantly antisemitic protests on Columbia's campus in the wake of the October 7 terrorist attack by Hamas against Israel.   https://www.algemeiner.com/2023/10/19/you-are-coward-israeli-columbia-university-professor-calls-out-president-silence-pro-hamas-protests/

105.   Macky became aware of Professor Davidai's video at or shortly after the time it was posted on-line on or about October 19, 2023.

106.   At CSSW alone, a student group well known for its anti-Israel positions, Columbia Social Workers 4 Palestine ("CSW4P"), announced a teach-in titled "Significance of the October 7th Palestinian Counteroffensive" and students staged multiple sit-ins and protests.   The "counteroffensives" included a November 8, 2023 occupation of CSSW's lobby by dozens of Columbia students chanting: "Intifada, Intifada," which has historically been the call to commit terror attacks against Jews, from morning until early evening.

107.   Columbia's security did not stop the protest or clear the lobby – and CSSW has not taken any action against the students involved or barred CSW4P from campus.

108.   Columbia also allowed protestors to plaster anti-Jewish manifestos calling for the eradication of Israel and the Jewish people throughout the halls of the CSSW building.   No effort was made by Columbia to prevent them from being displayed or to take them down.

109.   In light of the above, and the other well-documented instances of antisemitic violence which have taken place on Columbia's campus, Jewish students are understandably frightened and fear for their safety.

110.   Yet, Columbia in general, and CSSW in specific, has ignored the pleas of its Jewish students and failed to adequately assure their safety and security.

111.    Through both their actions and inaction, administrators at Columbia and CSSW have emboldened those who harass, intimidate, and threaten their Jewish students.

**HALF-HEARTED EFFORTS BY**
**COLUMBIA TO COMBAT ANTI-SEMITISM**

112.    On or about November 1, 2023, the Office of the President of Columbia University (defendant Shafik), announced the creation of a new "Task Force on Antisemitism." https://president.columbia.edu/news/announcing-task-force-antisemitism  (accessed on 1/17/2024 at 2:45 pm)

113.    The announcement acknowledged that (i) the Taskforce was necessary "to ensuring that our campuses are safe, welcoming, and inclusive for Jewish students, faculty, and staff, and all of us" and (ii) "[w]e have been distressed that a series of antisemitic incidents on campus have been reported in the three weeks following the October 7 terror attack in Israel and outbreak of war in Gaza."  *Id*.

114.    The Task Force asserted that "we will not tolerate such actions" (i.e., the "series of antisemitic incidents on campus"), that "forceful[]" action is needed against "against antisemitic threats, images, and other violations," and that it "will identify practical ways for our safety and inclusion work to enhance support for all members of the Columbia, Barnard, and Teachers College communities, particularly our Jewish students."  *Id*.

115.    The Task Force ended its announcement with a call to action for entire community to combat anti-Semitism.  "This is an opportunity for every academic department, every faculty member and teaching assistant, every member of the administration, and every member of the Columbia, Barnard, and Teachers College student family to bring their ideas, life experiences, and spirit to help us emerge as a stronger and more cohesive community."  *Id*.

116.   While Shafik correctly identified a real and present danger to Columbia's Jewish community, she failed to put in place the means necessary to protect Columbia's Jewish students.

117.   The Task Force failed miserably and has done little or nothing to fulfill its alleged mandate.  Jewish students, at all times since the establishment of the Task Force, have continued to be at risk at Columbia.

118.   Protecting Jewish students at Columbia is simply not a priority.

## COLUMBIA FAILS TO HONOR MACKY'S
## <u>REASONABLE REQUEST FOR AN ACCOMMODATION</u>

119.   Understandably, Macky, as an Orthodox Jew, feared for her safety on Columbia's campus and did not feel safe attending her CSSW classes in person.

120.   Macky's fears were based on, among other things: (i) the statements of Shai Davidai, the Columbia professor who said the Columbia campus was not safe for Jews and that he would not send his own children to Columbia; (ii) protesters blocking access to the Columbia campus and the CSSW building during unauthorized protests, sit-ins and teach-ins; (iii) a Jewish student being physically assaulted on Columbia's campus; (iv) multiple Jewish students being verbally assaulted and harassed while on Columbia's campus; (v) the posting of manifestos calling for the destruction of Israel and eradication of the Jewish people on the walls of the CSSW building, and (vi) the failure of Columbia and CSSW to take action to prevent violations of school policies meant to protect students.

121.   Thus, shortly after the events of October 7th and the explosion of antisemitism on Columbia's campus, Macky concluded that the only way to assure her safety would be for her to attend classes remotely via Zoom until Columbia was made safe for Jewish students.

122.   Macky's request was academically feasible.  Students in the DBT Program spend most of their time at clinical "field placements" not on Columbia's campus.  Moreover, Macky's

desire to attend classes via Zoom only applied to the three courses on Tuesdays that she was taking on Columbia's campus.

123.   As discussed below, despite her repeated requests— and even though CSSW offers classes via Zoom—Macky was told that as a member of the DBT Program she was required to attend her classes in person on Columbia's campus.  If she did not attend her classes in person, she would fail the DBT Program and have to leave.

124.   CSSW did not allow Macky to attend classes online even though it had previously allowed other students to attend certain classes online and even though it ultimately allowed all students to attend classes online on December 6, 2023, the day of a scheduled "teach-in" in support of Hamas.

125.   Obviously, the option for attending classes online existed – CSSW simply refused to provide it to Macky despite her reasonable fears for her safety as a Jewish student.

126.   Moreover, while Macky was denied the opportunity to attend classes via Zoom, other non-Jewish students were offered, and took advantage of the identical accommodation.

127.   Macky raised her safety fears during an October 19, 2023 Zoom meeting with Elizabeth Creel, Macky's CSSW advisor.

128.   Macky mentioned the statement in the President of Columbia's October 18th e-mail that "special accommodations" were available to help students cope with the situation.  To that end, Macky raised the possibility of completing her coursework for the semester over Zoom, in light of Columbia's failure to make the campus safe for its Jewish students.

129.   In response, Macky was gaslighted and told that she "is the only person feeling unsafe" – even though Columbia's President acknowledged the fear permeating Columbia's campus in her e-mail just the day before.

130.    Macky knew the statement that she "is the only person feeling unsafe" was false. Macky knew from in-person conversations, chats, and other social media outlets, that other Jewish students also felt under siege and physically threatened at Columbia.

131.    Ms. Creel also told Macky that attending classes over Zoom was not an option. Indeed, she chastised Macky for making such an "unreasonable request" and cruelly made a point of telling her that she would "not advocate" for any accommodation to be made, despite Macky not feeling safe on Columbia's campus.

132.    After the meeting, Macky felt dispirited and abandoned.  She also felt embarrassed by Ms. Creel's communication that her safety concerns were unreasonable and unwarranted.  She then sent an email to Ms. Creel stating:

> After reflecting upon our conversation I would appreciate it if you could keep what we said confidential. I will talk to [Dr. Ivanoff] in regards to what is best moving forward. Thank you[.]

133.    Ms. Creel responded to Macky's e-mail on October 21, 2023:

> Hope you are doing well.  I had already reached out to advising right after our conversation.  What I learned confirmed my assumptions. If you need to go home now, you will need to take a leave of absence.  Accommodations come in the form of extra time on papers and maybe tests
> . . .
>
> Sometimes the situation in front of us seems overwhelming and impossible. But I believe that with support you will be able to achieve what you want. Perhaps your family can come visit you more often here in NYC for the next month or two (just a suggestion).  I'm open to brainstorming with you.

134.    Ms. Creel's e-mail confirmed to Macky that the reasonable and legitimate fears she had about the safety of Columbia's campus were being entirely ignored.

135.    Having Macky's family "come visit [her] more often" obviously did nothing to make the Columbia campus safer for Macky and other Jewish students.

136.   On November 8, 2023, after Macky had told her mother "I'm afraid to go to class," Mrs. Forrest spoke to someone in the office of Dean of Students Affairs.  Mrs. Forrest was told that "it is absolutely not safe; if is she is on campus we will send security to get her."  Macky was not on campus at the time, so a security escort was not needed at that time.

137.   Over the course of the following days, Macky continued to raise her legitimate safety concerns with members of the CSSW administration and advising staff but was repeatedly told the same thing:  she was required to attend classes at CSSW in-person, and she would be given no accommodation to complete her semester online.

138.   In short, CSSW refused to make any accommodation to address Macky's reasonable fears for physical and psychological safety on campus.

139.   Worse yet, Macky faced retaliation for raising her safety concerns and was ultimately forced out of the DBT Program entirely.

## MACKY IS FORCED OUT OF THE DBT PROGRAM

140.   Not only did CSSW refuse to grant Macky's reasonable request for an accommodation, it punished her for it.

141.   CSSW administrators, including Dr. Ivanoff, told Macky that she would need to quit the DBT Program unless she could provide a 100% commitment to attending her classes in-person, regardless of what else was transpiring on campus.

142.   Clearly, Macky's concern for her own safety was utterly irrelevant to Dr. Ivanoff and the rest of the DBT Program staff.

143.   Unwilling to put up with Macky's legitimate concerns about her safety on Columbia's campus and the reasonable accommodations she requested as a Sabbath observer, at

the end of October 2023, Dr. Ivanoff and other administrators associated with the DBT Program began a campaign to force Macky out of the DBT Program entirely.[5]

144.    This campaign took two approaches.  First, DBT Program administrators for the first time raised the specter of Macky failing her field-based internship at CCG for not meeting expectations – even though until this point she had never received any indication that she was not performing satisfactorily at CCG.  Second, Macky's advisors at CSSW tried to recast Macky's request for an accommodation – specifically in order to continue in the DBT Program – as Macky exploring the possibility of dropping out of the DBT Program.

**a**. **Macky Is Threatened With Failing the DBT Program**

145.    Shortly after she requested to take her courses via Zoom, Macky was informed for the first time that she was at risk of receiving a failing grade for her field placement.  Prior to this, there was never any indication that Macky was not meeting expectations—let alone at risk of failing—her field placement.  Macky had been receiving straight As, and in her weekly meetings

---

[5]    This case is about *Columbia's* violations of federal and state law.  However, the failure of American universities to protect Jewish students from unchecked antisemitism is wide-spread and well-known.  The fact that hostility towards Jews is widespread in academia is relevant because it shows that Macky was reasonable in her belief that she faced an unsafe environment and was reasonable in her request to complete her studies in the DBT Program remotely.  The plague of antisemitism on American campuses has led to the filing of at least six other post-October 7 lawsuits:  The Louis D. Brandeis Center Inc., et al. v. Regents of the University of California at Berkeley, et al., U.S.D.C., N.D. Cal., S.F. Div., 23-cv-06133; Yael Canaan v. Carnegie Mellon University, U.S.D.C., W.D., Penn., 23-cv-02107-WSH; Eyal Yakoby, et al. v. University of Pennsylvania, U.S.D.C., E.D., Penn., 23-cv-04789; Bella Ingber, et al. v. New York University, U.S.D.C., S.D.N.Y., 23-cv-10023-PAC; Alexander Kestenbaum, et al. v. President and Fellows of Harvard College, U.S.D.C., D. Mass., 24-cv-10092; Ackerman v. Rutgers, The State University of New Jersey at al., Superior Ct. of New Jersey, Law Division, Essex Co. Dkt. No. ESX-L-000009-24.

The recent testimony before Congress by the presidents of Harvard University, University of Pennsylvania, and Massachusetts Institute of Technology in which they said that calling for genocide of Jews would not necessarily be prohibited by their codes of conduct, further illustrates the point that universities do not take antisemitism seriously.

with her supervisor, she was never told that she was not meeting expectations. Receiving a failing grade in her field placement would mean Macky would not only be unable to continue in the DBT Program, but it would become part of her record and likely adversely affect her career going forward.

146. This newly created issue about Macky' performance in her field placement was all a pretext to create an excuse to kick Macky out of the DBT program.

147. In an October 27, 2023, e-mail which started off by discussing the issue of Macky's attendance at Suicide Weekend, Dr. Ivanoff for the first time raised "concern[s]" about Macky's "performance in the field" at CCG. Dr. Ivanoff stated:

> I did meet with your internship supervisor earlier this week and am concerned about your performance in the field. After you have followed up with appropriate meetings, we should meet to discuss that as well as there are behavioral performance expectations for students in the DBT Training Program.

148. Until this e-mail, no one had ever raised any "issues" about Macky's performance with her. To the contrary, she maintained a perfect grade point average at CSSW and her internship was progressing nicely at CCG.

149. Macky responded to Dr. Ivanoff's e-mail and wrote:

> Regarding my performance in field placement, I have been attending regular meetings with my supervisor, but no performance issues have been raised during these discussions. At the beginning of the semester, I took great care to outline all the field expectations and responsibilities in a concise document (attached here). I reviewed this document with Alexis, my supervisor, to ensure a clear understanding of my role during one of our first supervision sessions. Additional expectations were not discussed or have surfaced since the start of the field placement. I have been following these expectations diligently since day one. As a result, I am confused about any unforeseen issues that may have arisen.
>
> Thank you for your understanding and support. I look forward to resolving these matters and continuing to contribute to our shared goals.

150.   Macky's "performance issues" at CCG were also raised during other meetings with CSSW administrators at the very end of October 2023 – meetings which were ostensibly scheduled to address Macky's safety concerns.

151.   Again, none of these "performance issues" had ever been previously raised with Macky, and indeed, they were patently untrue.  They were raised simply as a pretext to force her out of the DBT Program.

152.   For example, CSSW administrators asserted that Macky was only seeing one DBT client and was declining to take on new clients.  While it was true that Macky had one DBT client, it had never been communicated to her that there was a minimum or maximum number of DBT clients that she was expected to see. To the contrary, Macky had initially gone over the expectations with Ms. Santiago-Autar and those expectations did not include a specific minimum requirement of DBT clients.

153.   In any event, at no time did Macky ever decline to take on a new client.

154.   Nonetheless, the DBT Program used these alleged "performance issues" as a cudgel to force Macky out of the DBT Program.  In early November 2023, Macky was told that she was going to receive a failing grade for her field placement.  However, she was also told that if she was willing to drop out of the DBT Program, she would be allowed to withdraw from the field placement and no grade would be recorded on her transcript.

155.   Thus, Macky was faced with the Hobson's choice: drop out of the DBT Program or receive a failing grade in her field placement.

156.   The fact that Macky's alleged "performance issues" were only first raised shortly before the CSSW deadline to withdraw from a class only exacerbated the issue and did not give

Macky adequate time to try to address any concerns about her performance – pretextual as they might be.

157.   Because she did not want to have a failing grade on her record, and because it was obvious that she would be failed if she continued in the DBT Program, Macky had no other choice but to withdraw from the DBT Program.

158.   Between: (i) Dr. Ivanoff's resistance when she raised her need for sabbath accommodation, (ii) the faculty's refusal to allow her to take classes via Zoom after the spike in antisemitism on campus and her fearing for her safety, (iii) the slew of newly concocted pretexts that she was not meeting program requirements, (iv) the threat that if she stayed in the program she would be failed, and (iv) the requirement that she – and only she – provide a 100% commitment to attending classes in person despite her reasonable concerns for her physical safety, Macky got the message loud and clear that she was being forced out of the DBT Program.

159.   Macky was faced with another Hobson's choice of continuing in the DBT Program and putting her physical safety at risk, or switching to a different field of study that she could pursue through online coursework.

160.   Of course, Macky should never have had to make that choice.  Macky was only faced with these choices because of Columbia's failure to take the necessary steps to provide a safe campus environment for Macky and its other Jewish students.

161.   Thus, given no other real choice, Macky withdrew – or, more accurately, was forced to withdraw – from the DBT Program on December 14, 2023.

162.   Columbia and CSSW's conduct constitutes an egregious violation of Title VI of the Civil Rights Act of 1964, as well as a violation of New York law.  Accordingly, Macky brings this action for damages and injunctive relief.

**b.  CSSW Attempts To Claim Macky Wanted To Leave The DBT Program**

163.    With respect to the communications Macky was having with her advisors about potential accommodations, she repeatedly reiterated her desire to stay in the DBT Program, albeit in a way that ensured her physical safety.

164.    Until the very end, CSSW administrators tried to characterize Macky's withdrawal from the DBT Program as her choice – even though in reality, it was anything but.

165.    For example, in a November 16, 2023 e-mail, the CSSW Director of Advising, Yesika Montoya, stated that "[a]s a result of the feedback shared with all parties, it was agreed that Mackenzie is no longer continuing in the DBT program . . ."

166.    Macky responded to that e-mail and made it clear that it was quite the opposite:

Thank you for your email. Unfortunately this is not consistent with what occurred at the meeting. I was told if I stayed in the program I would be failed or that I had to leave. This is not what I wanted to do. Your email implies that we came to an amicable agreement on how to best proceed, but we did not.

Since I still would like to be a DBT clinician, I have been forced out of my specialization of choice in order to avoid giving up graduation. What is most troubling about this is I believe I am being punished for being an observant Jew who is concerned for her safety.

167.    Simply put, Macky has been victimized by defendants because she is Jewish.

**COLUMBIA FAILS TO ENFORCE
ITS OWN RULES OF CONDUCT**

168.    Columbia has numerous written policies, publications, rules, regulations, codes, and procedures that allegedly are intended to protect Jewish students, such as Macky, from specifically anti-Jewish harassment, threats, intimidation, and hostile environments.

169.    These written documents form a part of the contractual relationship between Macky and Columbia.

170.   Columbia's Statement of Ethical Conduct applies to "all officers of instruction, research, libraries, athletics, and administration; support staff; and students."

171.   The Statement's "basic principles" requires those people to *inter alia*, "[o]bey the law" and "[f]ollow University policies and procedures."

https://universitypolicies.columbia.edu/content/statement-ethical-conduct-and-administrative-code-conduct (accessed 1/17/2024 at 4:51 pm)

172.   The Statement further provides that "[a]n individual's failure to live up to these principles may result in disciplinary action, including suspension, termination, and monetary fines consistent with University policy. For violations of applicable laws, individuals may also face criminal and civil penalties, including monetary penalties." *Id.*

173.   As became abundantly clear to Macky, Columbia's Statement of Ethical Conduct did little or nothing to protect Columbia's Jewish students.

174.   Columbia's Rules of University Conduct are found in Chapter XLIV of the Statutes of Columbia University.

https://universitypolicies.columbia.edu/content/rules-university-conduct

(accessed 1/17/2024 at 5:21 pm)

175.   "The Rules of University Conduct shall apply to all members of the University community: administrators, administrative staff, research staff, library staff, supporting staff, faculty, and students." *Id.*, § 442. Jurisdiction.

176.   "The Rules of University Conduct apply to any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity. Such facilities include, but are not limited to, all University campuses, research laboratories,

27

maintenance shops, business offices, athletic fields, dormitories, classrooms, and meeting halls."

*Id.*, § 442. Jurisdiction.

177.   Section 443(a) states that

[a] person is in violation of these Rules when such person individually or with a group, incident to a demonstration, including a rally or picketing:

(1) (simple violation) engages in conduct that places another in danger of bodily harm;
(2) (serious violation) causes or clearly attempts to cause physical injury to another person;
(3) (simple) uses words that threaten bodily harm in a situation where there is clear and present danger of such bodily harm;
(4) (serious) uses words in a situation of clear and present danger that actually incite others to behavior that would violate Sections 443a (2) or (6);
(5) (simple) causes minor property damage or loss, or endangers property on a University facility;
(6) (serious) misappropriates, damages, or destroys books or scholarly material or any other property belonging to the University, or to another party, when that property is in or on a Uni-versity facility, and by such action causes or threatens substantial educational, administrative, or financial loss;
(7) (simple) interferes over a short period of time with entrance to, exit from, passage within, or use of, a University facility but does not substantially disrupt any University function;
(8) (serious) continues for more than a very short period of time to physically prevent, or clearly attempt to prevent, passage within, or unimpeded use of, a University facility, and thereby interferes with the normal conduct of a University function;
(9) (serious) enters or remains in a University facility without authorization at a time after the facility has been declared closed by the University; (Comment: The University shall make all reasonable attempts to publicize this declaration to the fullest extent possible.)
(10) [omitted];
(11) [omitted]
(12) (simple) causes a noise that substantially hinders others in their normal academic activities;
(13) (simple) briefly interrupts a University function;
(14) (serious) disrupts a University function or renders its continuation impossible.

178.   Columbia's Rules of University Conduct did little or nothing to protect

Columbia's Jewish students, including Macky.

28

179.   The "protections" contained in the Rules of Conduct are effectively nullified by Columbia's refusal to deploy them in the protection of Jewish students.

180.   At Columbia, the Jews are on their own.

### COUNT I
(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.)
(All Defendants)

181.   Plaintiff repeats all the allegations set forth in the paragraphs above.

182.   Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d, provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

183.   Columbia receives Federal financial assistance, including assistance from the U.S. Department of Education.

184.   The DBT Master's Program at CSSW is a program or activity under Title VI.

185.   Title VI of the Civil Rights Act of 1964 applies to Columbia, including CSSW.

186.   Title VI as interpreted by the courts and by the Office of Civil Rights of the U.S. Department of Education, prohibits discrimination based on religion if it is part of one's shared ancestry or ethnicity, including discrimination against people of the Jewish faith, such as Macky.

187.   Title VI prohibits Columbia from discriminating against Macky on the basis of her Jewish shared ancestry or ethnicity.

188.   Defendants' conduct, as alleged in detail above, denied Macky the benefits of, and subjected Macky to discrimination under, the DBT Program at CSSW.

189.   Defendants' conduct, as alleged in detail above, constitutes discrimination against Macky on the basis of her Jewish shared ancestry and ethnicity.

190.   Defendants' conduct, as alleged in detail above, constitutes a violation of Title VI.

191.   By reason of the foregoing, Plaintiff is entitled to (i) preliminary and permanent injunctive relief prohibiting all defendants from discriminating against her on the basis of Jewish shared ancestry or ethnicity and requiring defendant Columbia to enforce its own rules against discrimination and harassment based on a person's religion, race, color, ethnicity, and/or national origin, prohibiting defendant Columbia from continuing to violate Title VI, and providing additional, appropriate injunctive relief, and (ii) money damages, in an amount to be determined at trial.

192.   Plaintiff is also entitled to her attorney's fees and expenses under 42 U.S.C. § 1988.

## COUNT II
### (New York Executive Law (Human Rights) § 296 *et seq.*)
### (All Defendants)

193.   Plaintiff repeats all the allegations set forth in the paragraphs above.

194.   N.Y. Exec. Law § 296(4) says, in pertinent part, as follows:

It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, age, marital status, or status as a victim of domestic violence, except that any such institution which establishes or maintains a policy of educating persons of one sex exclusively may admit students of only one sex.

195.   Plaintiff is a person protected by § 296.

196.   Columbia, including CSSW, is an "educational institution" under § 296.

197.   Section 296 prohibits discrimination against Jewish people, such as Plaintiff, on the basis of their actual or perceived religion, race and/or color.

198.   Section 296 applies to defendant Columbia, including CSSW.

199.   Defendants' conduct, as alleged in detail above, constitutes a "den[ial of] the use of its facilities" to Plaintiff under § 296.

200.   Defendants' conduct, as alleged in detail above, constitutes a violation of § 296.

201.   By reason of the foregoing, Plaintiff is entitled to (i) preliminary and permanent injunctive relief prohibiting all defendants from discriminating against her on the basis of Jewish religion, shared ancestry or ethnicity and requiring defendant Columbia to enforce its own rules against discrimination and harassment based on a person's religion, race, color, ethnicity,  and/or national origin, prohibiting defendant from continuing to violate § 296 and providing additional, appropriate relief and (ii) money damages, including treble and/or punitive damages, in an amount to be determined at trial.

202.   Plaintiff is also entitled to her attorney's fees and expenses under N.Y. Executive Law § 297(10).

### COUNT III
(New York Civil Rights Law§ 40-c)
(All Defendants)

203.   Plaintiff repeats all the allegations set forth in the paragraphs above.

204.   N.Y. Exec. Law § 291(2) provides as follows:

The opportunity to obtain education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space without discrimination because of age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, marital status, or disability, as specified in section two hundred ninety-six of this article, is hereby recognized as and declared to be a civil right.

205.   N.Y. Civ. Rights Law § 40-c provides as follows:

1.      All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2.      No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by

any firm, corporation or institution, or by the state or any agency or subdivision of the state.

206.    Section 40-c applies to defendant Columbia, including CSSW.

207.    Defendants' conduct, as alleged in detail above, constitutes "discrimination in [Plaintiff's] civil rights" under N.Y. Civ. Rights Law § 40-c, in connection with her "opportunity to obtain education," a civil right under N.Y. Exec. Law § 291(2).

208.    Defendants' conduct, as alleged in detail above, constitutes a violation of N.Y. Civ. Rights Law § 40-c.

209.    Plaintiff has given notice to the N.Y. State Attorney General before the commencement of this action by serving a copy of this Complaint, as required by N.Y. Civ. Rights Law § 40-d.

210.    By reason of the foregoing, Plaintiff is entitled to (i) preliminary and permanent injunctive relief prohibiting all defendants from discriminating against her on the basis of Jewish creed, race, religion, shared ancestry or ethnicity and requiring defendant Columbia to enforce its own rules against discrimination and harassment based on a person's creed, race, religion, shared ancestr, ethnicity, and/or national origin, and prohibiting defendant from continuing to violate § 40-c and providing additional, appropriate relief and (ii) money damages, including treble and/or punitive damages, in an amount to be determined at trial.

**COUNT IV**
(Breach of Contract)
(Defendant Columbia)

211.    Plaintiff repeats all the allegations set forth in the paragraphs above.

212.    At all times relevant to this complaint, an express and/or implied contract relationship existed between Macky and Columbia by virtue of her status as an enrolled, matriculated graduate student in a Master's program at CSSW.

213.   The terms of the contractual relationship are contained in the various documents executed by Macky and in the various publications, rules, regulations, codes, and procedures issued by Columbia (collectively, the "Agreement").

214.   Under the express and implied terms of the Agreement, Columbia was obligated to take reasonable measures to (i) prevent discrimination by the Columbia "community" as defined in Rules of University Conduct § 442, against Macky based on her Jewish identity, (ii)  protect Macky from harm, threats, and harassment and to provide a safe environment for her education, studies, and school work on the Columbia campus and in surrounding areas controlled or operated by Columbia and (iii) accommodate  legitimate concerns for Macky's safety.

215.   As detailed in the allegations above, defendant Columbia, including CSSW, breached its Agreement with Macky.

216.   To the extent not explicitly provided for in the Agreement, Defendant Columbia breached the implied covenant of good faith and fair dealing in the Agreement by not extending the same level of protection to Jewish students, such as Macky, as extended to members of other actual of perceived religious, racial, ethnic, groups.

217.   By reason of the foregoing, Macky is entitled to money damages in an amount to established at trial for breach of contract.

## COUNT V
(New York General Business Law §§ 349, 350)
(Defendant Columbia)

218.   Plaintiff repeats all the allegations set forth in the paragraphs above.

219.   N.Y. Gen. Bus. Law § 349 provides in pertinent part as follows:

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

* * *

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

220.   N.Y. Gen. Bus. Law § 350 provides as follows:

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

221.   Sections 349 and 350 apply to defendant Columbia, including CSSW.

222.   Defendant Columbia made representations, statements, and promises to induce Macky to believe that Columbia would take reasonable steps to protect her from, and to prevent the occurrence of, situations where she would experience reasonable fear of abuse, harassment and physical harm from the "community" as defined in Rules of University Conduct §442, during the time Macky is a student at CSSW.

223.   Defendant Columbia made representations, statements, and promises to induce Macky to believe that Columbia would take reasonable steps to protect her from, and to prevent the occurrence of, situations where she would experience discrimination and hostility from the Columbia community, on account of her Jewish identity.

224.   Defendant Columbia's representations, statements, and promises, as detailed in the preceding paragraphs of this complaint, were deceptive and false because Columbia, including CSSW, did not and does not protect Jewish students such as Macky from harassment and intimidation and did and does not accord Jewish students the same level of accommodation and protection that it accords non-Jewish students.

225.    Defendant Columbia's conduct, as alleged in detail above, constitutes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

226.    Defendant Columbia's conduct, as alleged in detail above, constitutes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

227.    Defendant Columbia's conduct, as alleged in detail above, constitutes a violation of sections 349 and 350.

228.    Macky's decision to enroll in the Master's program at CSSW was motivated in part by her reliance on Defendant Columbia's conduct as detailed above.

229.    By reason of the foregoing, Macky is entitled to actual and treble damages in an amount to be established at trial.

230.    Plaintiff is entitled to attorneys' fees and costs pursuant to N.Y. General Business Law § 349(h).

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all applicable issues and claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays and demands that a judgment be entered in her favor, and against Defendants awarding her relief as follows:

**A.** Preliminary and Permanent Injunctive relief preventing and enjoining Defendants from violating Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*,; New York Executive Law (Human Rights) § 296 *et seq.*; and New York Civil Rights Law § 40-c, including, but not limited to, preventing and enjoining Defendant Columbia and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that

penalize or discriminate against Jewish students, including Plaintiff, in any way, and ordering Defendants to take all necessary, adequate, and appropriate remedial, corrective, and preventative measures including by, among other things: (i) disciplinary measures, including the termination of, deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) reforming and/or eliminating Diversity, Equity, and Inclusion protocols that encourage and/or foster antisemitism; and (iv) adding required antisemitism training for the Columbia community members;

**B.** Damages, including treble damages and/or punitive damages, as provided by law, in amounts to be determined at trial;

**C.** Reasonable attorneys' fees, costs of suit, and expenses;

**D**. Interest as provided by the law; and

**E.** Such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 9, 2024

EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS, P.C.

By: */s/ Eric R. Levine*
Eric R. Levine
805 Third Avenue
New York, New York 10022
212-752-1000
elevine@eisemanlevine.com
*-and-*
THE LAWFARE PROJECT LLP

By: */s/ Ziporah Reich*
Ziporah Reich
633 Third Avenue, 21st Floor
New York, NY 10017
212-339-6995
Ziporah@TheLawfareProject.org

*Co-counsel for Plaintiff*

## VERIFICATION

MACKENZIE FORREST, declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am the plaintiff in this case.

2.      I have read the foregoing complaint, know the contents thereof, and know said contents to be true, except for those matters alleged upon information and belief, which matters I believe to be true.  The sources of my information and the grounds of my belief as to matters alleged upon information and belief are my personal experiences, records (including emails and text messages,) and various documents exchanged between me and Columbia University and/or others.

I declare under penalty of perjury that the foregoing is true and correct and that this Verification has been executed in the United States.

Executed on February ___9___, 2024

_Mackenzie Forrest_
MACKENZIE FORREST