UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

MACKENZIE FORREST,

                      Plaintiff,

    -against-

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
MINOUCHE SHAFIK, ANDRE IVANOFF,
ELIZABETH CREEL, and
MELISSA BEGG,

                   Defendants.
--------------------------------------------------------------x

Case No. 24-cv-1034-MMG

**VERIFIED FIRST**
**AMENDED COMPLAINT**

Jury trial demanded.

       Plaintiff Mackenzie Forrest ("Macky" or "Plaintiff") avers for her first amended complaint against The Trustees Of Columbia University In The City Of New York ("Columbia"), Minouche Shafik, Andre Ivanoff, Elizabeth Creel, and Melissa Begg (collectively, "Defendants"), upon knowledge with respect to her own acts and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

    1.    This lawsuit tells the story of Macky, a straight-A Jewish[1] student at Columbia's School of Social Work ("CSSW") who was harassed and discriminated against and in an act of retaliation, forced out of an academic program simply because she is Jewish.

    2.    For many years, Columbia University has shamelessly enabled a culture of antisemitism that stands out even from its peers in the academic community. Columbia repeatedly violated the civil rights of Jewish students by directly discriminating against them and by allowing

---

[1] "Jewish" is not merely a religious description, it also includes Macky's "shared ancestry" and "ethnicity," categories which are protected under, *inter alia*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. Discrimination against Macky based on her religion and Jewish creed are prohibited by New York Executive Law (Human Rights) § 296 *et seq*. and New York Civil Rights Law § 40-c.

administrators, professors, and students to create an environment hostile to Jewish students. At Columbia, Jewish students have been subjected to pervasive acts of bigotry, harassment, and retaliation on the basis of their protected ethnic identity and shared ancestry. While Columbia has been acutely aware of the ongoing antisemitism permeating its campus, it has reacted with, at best, deliberate indifference and has refused to enforce its own anti-discrimination and harassment policies to protect its Jewish students.  As a result, Columbia has signaled to students and faculty that they are permitted to abuse, malign, and threaten Jewish students with impunity.

3.     Macky's initial encounter with antisemitism coming from faculty and administration at Columbia occurred when she requested a Sabbath accommodation from Dr. Andre Ivanoff, the director of CSSW's Dialectical Behavioral Therapy ("DBT") Program.  Dr. Ivanoff first attempted to bully Macky into forgoing her right to religious accommodation and only begrudgingly and ungraciously accommodated her legally protected request.

4.     The anti-Jewish hostility which Macky faced as a result of her encounter with Dr. Ivanoff  dramatically escalated in the wake of October 7, 2023, when Hamas attacked Israel and tortured, raped, burned, and killed over 1,200 people.

5.     The explosion of anti-Jewish discrimination on campus created a perilous environment for Jewish students, including Macky, and posed a legitimate threat to their emotional and physical well-being on campus.

6.     Fearing for her safety, Macky reported the antisemitic environment to Dr. Ivanoff and other administrators at the DBT program. But they did nothing to address her concerns.

7.     Macky then pleaded with the Columbia administration to allow her to attend her DBT classes over Zoom until the campus became safe for Jewish students. Dr. Ivanoff and Columbia's  administration refused.

8.    Instead, in apparent anger and retaliation, Dr. Ivanoff, together with the help of other DBT administrators, initiated a retaliatory campaign to find pretextual reasons to expel Macky from the program. Rather than supporting her, they focused on manufacturing baseless justifications to force her out, punishing her for reporting the antisemitism on campus and seeking protection.

9.    Dr. Ivanoff was able to discriminate against Macky with confidence because Columbia had long tolerated her history of antisemitic misconduct. Her discriminatory animus toward Jewish students was well-established even before Macky joined CSSW. In fact, Columbia's Office of Equal Opportunity and Affirmative Action (EOAA) had previously determined that Dr. Ivanoff had, on multiple occasions over the years, "engaged in discriminatory harassment" against Jewish students. Moreover, the EOAA concluded that Dr. Ivanoff's prior conduct—which closely resembled the harassment Macky faced—"would cause a reasonable student or colleague to feel subjected to an intimidating, hostile, or abusive learning or working environment."

10.    Despite Dr. Ivanoff's documented hostility and discrimination towards Jewish students, after a short one year sabbatical, Columbia returned Dr. Ivanoff to her position as Director of the DBT program where she resumed her habitual harassment, mistreatment and discrimination against Jewish students, including Macky.

11.    Macky's story, though egregious, is not unique. Columbia has tolerated a shocking culture of antisemitism that has left unchecked frequent verbal and physical manifestations of Jew-hatred. As a result, Jewish students at Columbia have been subjected to discrimination and harassment because of their Jewish identities. Columbia's inaction has left these students with no viable recourse within the university.

12.     Through this action, Macky seeks money damages based on federal, state, and common law claims arising out of defendants' unlawful discrimination and retaliation against her because of her status as an observant Jew. She also seeks to hold Columbia accountable for its discriminatory and brazen disregard for its obligation to ameliorate the anti-Jewish environment on campus. Columbia's failure to meet this obligation has enabled widespread discriminatory harassment against Jewish students, including Macky. Columbia's discriminatory acts, including its tolerance of a hostile educational environment, have caused Macky to suffer injury to herself, her educational experience, and her professional career.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq*.).  This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

14.     This Court has personal jurisdiction over the defendants because each of them is based and operates or works in New York, New York and because the acts complained of were committed by the defendants in this District.

15.     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and where Columbia is located.

## THE PARTIES

16.     Plaintiff Mackenzie Forrest is an individual of Jewish ethnicity and ancestry and a former Columbia student who attended CSSW from approximately August 2022 through May 2024.

17.     Defendant Columbia is a private, not-for-profit, tax-exempt educational institution, located in New York, New York, organized and existing under the laws of the State of New York. It operates, amongst other schools, CSSW.

18.     At all relevant times, Columbia was and continues to be a recipient of federal funding, making it subject to Title VI.

19.     Columbia is an "educational institution" within the meaning of the New York State Human Rights Law.

20.     Defendant Minouche Shafik is an individual who is or was at all relevant times employed by Columbia or CSSW.

21.     Defendant Andre Ivanoff is an individual who is or was at all relevant times employed by Columbia or CSSW.

22.     Defendant Elizabeth Creel is an individual who is or was at all relevant times employed by Columbia or CSSW.

23.     Defendant Melissa Begg is an individual who is or was at all relevant times employed by Columbia or CSSW.

## FACTS

### I.    MACKY'S BACKGROUND AND DECISION TO ATTEND CSSW

24.     Macky is a 24-year-old modern Orthodox Jew who was born and raised in Florida.

25.     Macky's Judaism is a fundamental part of her identity. She leads her life according to the tenants of halacha—or Jewish law—as practiced by Orthodox Jews worldwide. For example,

Macky keeps kosher and thus adheres to strict dietary strictures followed by Orthodox Jews. As another core tenet of her Jewish identity, Macky is Sabbath observant and refrains from performing activities which are prohibited by halacha on the Jewish Sabbath (*i.e.,* Saturdays).

26.    In May 2022, Macky graduated with honors from Babson College with a Bachelor of Science in Business, with concentrations in Finance and Environmental Sustainability. As a result of her excellent grades, she had a choice of schools she could attend for graduate school.

27.    Macky chose to pursue her Masters of Social Work ("MSW") at CSSW because it is the only social work program in the country that offers a subspecialty in Dialectical Behavior Therapy ("DBT"), a type of therapy that is particularly effective for treating complex disorders and provides its practitioners with unparalleled professional opportunities.[2]  The CSSW's DBT Program is a specialized program that runs from May of a MSW student's first year through graduation.

28.    CSSW's DBT program is unique. In Fall of 2022, CSSW characterized the program as "the only program of its kind at a school of social work." Macky specifically chose to obtain her Masters in Social Work at CSSW—rather than attend a different graduate program—because she aspires to be a DBT therapist.

29.    The DBT Program is only open to a limited number of CSSW students and requires students to apply and be accepted to the program through a competitive application process run by the Director of the DBT Program, Dr. Ivanoff.

30.    As the Director of the DBT Program, Dr. Ivanoff's main responsibilities include conducting informational sessions about the program for prospective students, finding and

---

[2]    Unlike typical undergraduate studies at college, the Master's program at CSSW does not have a "major" and a "minor" area of study, but the DBT Program could be thought of as being similar to a "minor."

6

approving internship sites, and running the application and admission process for the program. With respect to the application and admission process specifically, Dr. Ivanoff is responsible for reviewing all applications to the program, meeting with all applicants either before or after they meet with an admissions panel, and making the ultimate decisions as to who will be admitted to the program. Although Dr. Ivanoff claims to consider the opinions of the admissions panel in reaching her admission decisions, upon information and belief, she influences the final decisions as to which students will be admitted to the DBT program.

31.    Unbeknownst to Macky at the time that she decided to attend CSSW, Dr. Ivanoff has an extensive history of exhibiting discriminatory animus and hostile behavior towards Jewish students.

## II.    DR. IVANOFF'S HISTORY OF DISCRIMINATORY ANIMUS TOWARDS JEWISH STUDENTS AND COLUMBIA'S FAILURE TO ADDRESS IT

32.    On October 2, 2019, Jacquelyn Smith, a CSSW alumni who served as a Field Instructor/Supervisor for the DBT Program from 2009 through 2017 (except for the 2015-16 academic year) and was an adjunct faculty member for the DBT Program from 2014 through 2020, filed a Complaint with Columbia's Office of Equal Opportunity and Affirmative Action ("EOAA") against Dr. Ivanoff.

33.    Ms. Smith's Complaint with the EOAA alleged, among other things, that Dr. Ivanoff had subjected multiple Jewish CSSW students to discrimination and/or discriminatory harassment because of their religion, in violation of Columbia's policies.

34.    The EOAA investigated the Complaint by conducting interviews with several fact witnesses, including Ms. Smith, Dr. Ivanoff, and several others. The EOAA memorialized these interviews, together with the ultimate findings of their investigation, in a written Investigative Report (the "IR"). Pertinent excerpts of the IR are summarized below.

35.    On November 19, 2019, the EOAA conducted its interview of Ms. Smith. Relevant portions of Ms. Smith's EOAA interview (as reported in the IR) are summarized below:

    a.    Ms. Smith testified to recalling an incident in October 2018 where a Jewish student was unable to attend large portions of a DBT program taking place over a weekend because of the student's observance of the Sabbath. According to Ms. Smith, in response to the Jewish student's need for a religious accommodation, Dr. Ivanoff appeared to be angry with the Jewish student and indicated that she did not want to make the necessary accommodations so that the Jewish student could attend the event.

    b.    Ms. Smith also testified to a second, similar incident involving a Jewish student's inability to attend an event due to her Sabbath observance. According to Ms. Smith, Dr. Ivanoff stated,  "I never want to accept another Jewish student again," and that they are "too much of a problem."

35.    Although not included within the IR, Ms. Smith also provided Columbia with evidence of Dr. Ivanoff's discriminatory animus towards Jewish students in the form of an August 2018 email exchange about an internship start date for a student with a Jewish sounding name. In the email chain, Dr. Ivanoff asked the student: "Are you Jewish? Observant?" A copy of this email chain is attached hereto as <u>Exhibit A</u>.

36.    In a follow up email sent to Ms. Smith, also included in <u>Exhibit A</u>, Dr. Ivanoff wrote the following: "I do not think we have anyone who is observant, do we? **We cannot** [.]" (emphasis added).

37.    On November 14, 2019, the EOAA conducted an interview with a graduate of the CSSW who participated in the DBT Program referred to as "Witness 1." The IR reported that

during the EOAA interview Witness 1 reported that Dr. Ivanoff stated something similar to: "We've got to stop letting Jewish people into the program. Their schedule is not conducive."

38.     On December 5, 2019, the EOAA conducted an additional interview with a CSSW Instructor who taught in the DBT Program, referred to as "Witness 3." Witness 3 testified that Dr. Ivanoff told her they needed to "do something about the Jewish people in the program" on several occasions, and specifically recalled one instance in which Dr. Ivanoff expressed her wish to remove a Jewish student from the program because of the student's observance of Jewish holidays.

39.     Ultimately, as memorialized within the IR, the EOAA found sufficient evidence to support Ms. Smith's allegations that Dr. Ivanoff had "engaged in discriminatory harassment on the basis of religion."  The EOAA also concluded that the alleged statements made by Dr. Ivanoff relating to not wanting to let Jewish students into the DBT program due to the scheduling conflicts associated with their observance of Jewish holidays "would cause a reasonable student or colleague to feel like they had been subjected to an intimidating, hostile, or abusive learning or working environment." The EOAA further said that this was "particularly the case where, as here [Dr. Ivanoff] has the ultimate control and decision making authority over most aspects of the learning and working environment within a particular subspecialty."

40.     On May 26, 2020, the EOAA sent a letter to Ms. Smith summarizing the findings of their investigation. Among other things, the letter echoed the conclusions of the IR and stated that the EOAA had "determined, based on a preponderance of the evidence," that Dr. Ivanoff had engaged in discriminatory harassment of students based on their religion, in violation of Columbia's policies.

41.     Dr. Ivanoff subsequently appealed the EOAA's determination, and a review was conducted by Julie Kornfeld, Vice Provost for Academic Programs. On July 31, 2020, Ms.

Kornfeld sent a letter to Dr. Ivanoff relaying her decision "that the determination made by the EOAA should be upheld."

42.    After the EOAA determination in the Spring of 2020, Dr. Ivanoff was told by the CSSW administration to take a sabbatical for the 2020-2021 academic year, during which time she was not supposed to have any involvement with the DBT program.

43.    However, upon information and belief, Dr. Ivanoff continued to participate in the administration of the DBT Program during her sabbatical.

44.    More egregiously, once her sabbatical was over, Columbia returned Dr. Ivanoff to her prior position to resume her duties as the Director of the DBT program, where she could once again harass, discriminate against, and mistreat Jewish students in the DBT program—which she did to Macky.

45.    After forcing Macky out of the DBT program, Dr. Ivanoff continued with her campaign of discrimination against Jewish students.

46.    In 2023, Yaffa Mashkabov, an observant Jewish student at CSSW, applied for the DBT program and interviewed with Dr. Ivanoff. Upon recognizing Yaffa's Jewish head covering, Dr. Ivanoff told her that admitting an Orthodox Jewish student in the previous year had been a mistake she would not repeat.

47.    Yaffa reported this behavior to the Dean of CSSW, who dismissed her concerns and suggested that she was "misreading things." Ms. Mashkabov's written statement to the House Committee on Education and Workforce regarding this discrimination is attached hereto as Exhibit B.

III.    <u>**RELEVANT CSSW POLICIES AND ASSOCIATED LEGAL OBLIGATIONS**</u>

47.    Pursuant to the "Religious Holidays" policy set forth in CSSW's 2022-2023 Student Handbook, "[i]t is the policy of the University to respect its members' religious beliefs" and "each student who is absent from school because of their religious beliefs will be given an equivalent opportunity to register for classes or make up any examination, study, or work requirements they may have missed because of such absence on any particular day or days." In addition, the policy makes clear that "[n]o student will be penalized for absence due to religious beliefs, and alternative means will be sought for satisfying the academic requirements involved."

48.    CSSW's "Religious Holidays" policy also mirrors the mandates of New York law, which requires that "[a]ny student in an institution of higher education who is unable, because of his or her religious beliefs, to attend classes on a particular day or days shall, because of such absence on the particular day or days, be excused from any examination or any study or work requirements" and "[n]o person shall be expelled from or be refused admission as a student to an institution of higher education for the reason that he or she is unable, because of his or her religious beliefs, to register or attend classes or to participate in any examination, study or work requirements on a particular day or days." *See* N.Y. Educ. Law § 224-a (McKinney).

49.    Pursuant to Columbia's discrimination and harassment policies, employees of the University are strictly prohibited from engaging in discrimination and/or harassment against their students or coworkers on the basis of religion. Additionally, Columbia's policies also prohibit retaliation against individuals who report or raise concerns in good faith regarding potential violations of the school's discrimination and harassment policies.

11

IV.    **MACKY COMMENCES HER EDUCATION AT CSSW, IS ADMITTED TO THE DBT PROGRAM, AND IS THEREAFTER IMMEDIATELY AND INCESSANTLY SUBJECTED TO HARASSMENT AND DISCRIMINATION BY DR. IVANOFF AFTER OUTING HERSELF AS JEWISH**

50.    In August 2022, Macky moved to New York to pursue her Masters of Social Work ("MSW") degree at CSSW.

51.    After completing her first semester of coursework at CSSW, Macky applied for the school's DBT program. CSSW students interested in applying for the DBT program are ordinarily required to submit a statement of personal interest, provide references, and sit for two interviews. According to the CCSW website, applicants to the DBT program are purportedly evaluated "based on academic preparation, prior clinical experience with cognitive-behavioral interventions, and research interest."[3]

52.    As Macky does not have an identifiably Jewish name, Dr. Ivanoff would not have been aware of her Jewish identity at the time of her application.

53.    Macky's application to the DBT program was so strong that she was admitted without the need for a second-round interview.

54.    Macky accepted Dr. Ivanoff's invitation to join the DBT program within two days of receiving it.

55.    Immediately upon being accepted into the program, Macky informed Dr. Ivanoff that she was Jewish and observed the Sabbath and would need an accommodation for "Suicide Weekend." Suicide Weekend is the DBT program's two-and-a-half-day workshop seminar in suicide risk assessment and management. It is held over a weekend, and includes class on Saturday.

---

[3] *See* https://web.archive.org/web/20240228093216/https://blogs.cuit.columbia.edu/dbt/training/  (website last visited on November 8, 2024).

56.    Dr. Ivanoff's demeanor towards Macky immediately changed as she said "**that is a problem**."  Apparently realizing the inappropriateness of her response to Macky, Dr. Ivanoff corrected herself by saying: "well, not a problem, but an issue."

57.    This was just the first of many instances in which Dr. Ivanoff would characterize Macky's Jewish identity and religious observance as a "problem" or "issue" for her. As discussed in more detail below, from the time that Macky began her coursework in the DBT program in May 2023 through her forced exit from the program in December 2023, the open hostility and antisemitism that Macky was subjected to by Dr. Ivanoff because of her Jewish identity was frequent, pervasive, and pernicious.

58.    Much of Dr. Ivanoff's antisemitic hostility centered on Macky's request for a religious accommodation for Suicide Weekend, which was to take place the weekend of October 27-29 in 2023.

59.    As discussed above, Macky had informed Dr. Ivanoff of her Sabbath observance immediately upon her acceptance to the DBT program and raised it in other conversations as well.

60.    Notwithstanding these conversations, as the date for Suicide Weekend grew closer Dr. Ivanoff began harassing Macky about her request for the religious accommodation.

61.    Specifically, in a text sent on September 20, 2023, Dr. Ivanoff said:

I really think you need to talk to both your rabbi in Florida and your advisor at Columbia. When you signed up for this program you were aware of suicide weekend which is a Friday night and all day Saturday and Sunday.  I assume your religious observances have not changed since that time –am I wrong?

I am unclear what sort of accommodation you thought might be available for missing this experiential 2 ½ day workshop but I can tell you it is integral to DBT training.  I think you need a weekend long dispensation from your rabbi to attend this educational work and to participate fully including using computer media etc. etc. to complete this important work. . .

62.    On September 26, 2023, Dr. Ivanoff sent Macky another text stating:

Hi Macky—I'm wondering what you've worked out with advising, your Rabbi & field instructor about your participation in suicide weekend?

63.     In response to these texts, Macky reiterated that, as a Sabbath-observant Orthodox Jew, she was unable to attend on the Sabbath, but was "able to fully attend and participate on Sunday."

64.     After Macky refused to give up her right to get a religious accommodation, Dr. Ivanoff told Macky that she should not come to Suicide Weekend even on the day Macky was available to attend, and that she would create an alternative assignment for her.

65.     Macky's interactions with Dr. Ivanoff concerning Suicide Weekend – specifically, Dr. Ivanoff's demands that Macky compromise on her Sabbath observance to attend Suicide Weekend – demonstrated to Macky that her Orthodox Jewish religious observance was indeed a "problem" or "issue," just as Dr. Ivanoff had indicated during their first conversation upon Macky's acceptance into the DBT Program.

66.     The pressure exerted and hostility exhibited by Dr. Ivanoff towards Macky because of her need for religious accommodation and inability to attend Suicide Weekend during the Sabbath caused Macky severe distress and negatively impacted her life and experience at CSSW.

## V.    BY ALL ACCOUNTS, MACKY WAS WIDELY REGARDED AS AN EXEMPLARY STUDENT UNTIL DR. IVANOFF SPEARHEADED A CAMPAIGN TO MANUFACTURE PRETEXTUAL REASONS TO PUSH HER OUT OF THE DBT PROGRAM BEGINNING IN LATE OCTOBER 2023

67.     Macky's education in the DBT Program began in May 2023 and, as part of the program, Macky enrolled in two summer classes at CSSW.  As with all her prior classes at CSSW, Macky maintained a perfect grade point average in these two summer classes.

68.     In the Fall of 2023, Macky enrolled in classes specifically required for DBT program students. Macky's Fall classes met once a week at CSSW's campus.

69.    In addition to her coursework, Macky – like all DBT Program students – was placed in a field-based DBT internship to gain further experience working with DBT practitioners and patients during the Fall 2023 semester.

70. Macky – together with two other students in the DBT Program – was placed at the Counseling Center Group ("CCG") for her internship.

71. Macky's orientation and training at CCG took place exclusively online – via Zoom and other similar platforms.

72. In fact, the only time that the DBT Program students were required to be present in one of CCG's offices was if they were providing counseling to a client who chose to be seen in-person rather than via Zoom.

73. In late September, Macky met with CCG's Clinical Director, Alexis Santiago-Autar ("Ms. Santiago-Autar"), to go over CCG's expectations of Macky and the role and responsibilities Macky would have as an intern.

74. In advance of this meeting, Macky prepared a document outlining what she understood her role and responsibilities to be at CCG.  Macky went over this document with Ms. Santiago-Autar during their meeting and Ms. Santiago-Autar confirmed to Macky that it accurately reflected what was expected of Macky.

75. Macky was presented her first client at CCG in September 2023. The client preferred to meet over Zoom, rather than in-person and Macky agreed to work with her in this manner.

76. In addition to seeing her client, Macky was also tasked with presenting the case to a consult team and co-facilitating a multi-family skills group.

77. Macky and Ms. Santiago-Autar had weekly meetings to discuss her client, as well as the other work Macky was performing at CCG.

78. Ms. Santiago-Autar never raised any concerns about Macky's performance during these weekly meetings. To the contrary, she regularly complemented Macky on the work she was doing and on her general attitude and professionalism.

79. Similarly, Macky was also excelling in her Fall 2023 coursework at CSSW. None of her professors ever raised any concerns about her performance or workload. To the contrary, Macky was on track to maintain the perfect grade point average she achieved in her first-year courses.

## VI. ANTISEMITISM AT COLUMBIA REACHES AN ALL-TIME HIGH IN THE AFTERMATH OF OCTOBER 7, FURTHER EXACERBATING THE ALREADY HOSTILE EDUCATIONAL ENVIRONMENT THAT MACKY WAS FORCED TO ENDURE AT CSSW IN PURSUIT OF HER MSW DEGREE AND DBT SUBSPECIALTY

80. The antisemitism in the DBT program, in CSSW, and among Columbia's faculty, administration, and students as a whole reached unprecedented heights following the unspeakable horrors of October 7, 2023—when Hamas terrorists invaded Israel and tortured, raped, slaughtered, burned, and mutilated over 1,200 people, including infants, children and the elderly.

81. Indeed, in the immediate aftermath of October 7, Columbia faculty and students openly lauded Hamas' October 7 attack as an "awesome" act of "resistance."

82. The situation only continued to get worse from there, unleashing an explosion of antisemitism on Columbia's campus and exacerbating the already hostile educational environment that Macky had been forced to endure in DBT program because of Dr. Ivanoff's harassing and discriminatory conduct. From campus protests calling for the genocide of Jews, including some that resulted in physical harm to Jewish students, to the posting of antisemitic manifestos in the halls of CSSW where Macky attended classes, Columbia became a "war zone" for Macky simply because she is a Jew.

84.     Many Columbia students and faculty members—including those in the CSSW—proudly and enthusiastically endorsed Hamas and justified the terrorist group's efforts to destroy Israel and exterminate the Jewish people.  For example, Columbia Professor Joseph Massad endorsed the attack as a "stunning victory" that might begin a Palestinian "war of liberation." Similarly, more than 20 student groups and 140 faculty signed letters that blamed Israel for the attack and justified it as a form of resistance.

85.     These and other expressions of support for Hamas manifested themselves in mass, and sometimes violent, protests at Columbia.  These protests have occurred frequently, if not daily on campus since the October 7 terrorist attack.

86.     On October 12, 2023, less than a week after the October 7 massacre, hundreds of students gathered on Columbia's quad for a rally organized by Students for Justice in Palestine and Jewish Voice for Peace. The rally featured anti-Israel and antisemitic chants such as "from the river to the sea," a violent call for the elimination of the Jewish state. The scale of the protest led to the campus Kraft Center for Jewish Student Life being placed on a security lockdown for the safety of those inside.

87.     Columbia's response to these violent acts was limited and delayed. On October 18, 2023, over a week after antisemitic protests and attacks had begun, Columbia's then President, defendant Minouche Shafik, sent an e-mail titled "Upholding Our Values."  The e-mail acknowledged the obvious safety concerns students felt from the protests on Columbia's campus and stated, in part:

> Many of our students, faculty, staff, and colleagues are suffering great distress over the terror attacks on Israel and the humanitarian crisis in Gaza. . . .
> Our day-to-day duty of care for the security and well-being of our students, faculty, and staff is paramount. Some students may need special accommodations as they cope with fear and grief, and those arrangements can be made through advisors or deans of students.

We know that the atmosphere on campus is extremely charged, and some of you have expressed concern about your personal security. Let me reassure you that the University will take all available steps to help you. We have increased public safety presence across all of our campuses. We are also working with outside security firms for additional support and are in regular contact with the New York City Police Department. We have added resources to our existing hotline and escort service and I encourage anyone who is concerned about their safety to use it.

Debate, advocacy, and protest are essential ways for students to address and process political and social turmoil, and we are duty-bound to ensure they can gather and express themselves. We will continue to observe all necessary safeguards around these activities and will work closely with students to ensure that they adhere to our event guidelines.

Unfortunately, some are using this moment to spread antisemitism, Islamophobia, bigotry against Palestinians and Israelis, and various other forms of hate. I have been disheartened that some of this abhorrent rhetoric is coming from members of our community, including members of our faculty and staff. Especially at a time of pain and anger, we must avoid language that vilifies, threatens, or stereotypes entire groups of people. It is antithetical to Columbia's values and can lead to acts of harassment or violence. When this type of speech is unlawful or violates University rules, it will not be tolerated. . . .

88.    Unfortunately, this e-mail was nothing more than an empty gesture.  Shafik caused little if anything to be done to protect the safety and wellbeing of Columbia's Jewish students and harassment continued unfettered on campus.

89.    The "special accommodations" consisted of nothing more than extra time on exams.

90.    The mob-like protests, sit-ins, and demonstrations continued with ferocity.

91.    In light of these, and other similar incidents, Shai Davidai, an assistant professor of management at Columbia Business School wrote his now well publicized piece titled: "I'm a Jewish Columbia professor.  I wouldn't allow my children to go here now." www.cnn.com/2023/11/03/opinions/israel-cornell-jewish-threats-columbia-hamas-davidai/index.html  (website last visited on February 12, 2024).

92.    In his piece, Professor Davidai states:

Were they older, I would have loved for my children to attend an incredible institution like Columbia. But not now, not under this leadership. I would be too worried for their safety. The differences between the student organizations' chant of "from the river to the sea" and the Nazi chant of "Germany for Germans" are mere semantics. The antisemitic sentiment is the same.

It is not just these chants that keep me up at night. It is the antisemitic violence that inevitably follows when university leaders are willing to look the other way.

There is the Israeli student who was physically attacked at my workplace, Columbia University, while hanging posters of the kidnapped babies in Gaza, the Jewish students here who have been spat on, cursed at and received death threats.

93.    Professor Davidai may be best known for a video that went viral in which he accused Columbia's President of being a "coward" because she was unwilling to speak out against the blatantly antisemitic protests on Columbia's campus in the wake of the October 7 terrorist attack by Hamas against Israel.  https://www.algemeiner.com/2023/10/19/you-are-coward-israeli-columbia-university-professor-calls-out-president-silence-pro-hamas-protests/    (website last visited on November 11, 2024).

94.    Macky became aware of Professor Davidai's video at or shortly after the time it was posted online on or about October 19, 2023.

95.    The antisemitic protests were particularly vitriolic at CSSW, which Macky attended. Shortly after October 7, 2023, students at CSSW formed Columbia Social Workers for Palestine ("CSW4P"). This student group released a founding manifesto on November 8, 2023, which drew on Columbia's own assigned readings in its Power, Race, Oppression and Privilege framework and stated that the group would be "unequivocally supporting Palestinian resistance." The statement also questioned whether Hamas's activities were terrorism, saying that "[t]he word terrorism is misappropriated to classify anti-imperial efforts as immoral or barbaric."

96.    On November 8, 2023, CSW4P organized a sit-in in the lobby of the School of Social Work building. More than fifty students filled the lobby to declare their "solidarity with the

Palestinian national resistance." They used amplified noise, including a bullhorn and drum, to spread their antisemitic message.

97.     Senior Vice President of Columbia Gerald M. Rosberg informed the students they were in violation of university policies, but they were not dispersed for over nine hours.

98.     CSSW has not taken any action against the students involved or barred CSW4P from campus.

99.     Columbia also allowed protestors to plaster anti-Jewish manifestos calling for the eradication of Israel and the Jewish people throughout the halls of the CSSW building.  No effort was made by Columbia to prevent them from being displayed or to take them down.

100.    On December 6, 2023, CSW4P held a second teach-in in the CSSW lobby, described on posters for the event as a discussion "of the Palestinian counteroffensive on October 7th" and "the centrality of revolutionary violence to anti-imperialism." Speakers at the event praised the October 7 terror attacks.

101.    Though Columbia had stated that the event would not go forward, the administration failed to prevent it and the teach-in proceeded as planned. Indeed, Columbia staff provided the antisemitic protesters with umbrellas to conceal their identities from photographers. In a belated recognition of the threat to Jewish students and a capitulation to the protesters, Columbia allowed social work students to attend class remotely that day.

102.    In light of the above, and the other well-documented instances of antisemitic violence which have taken place on Columbia's campus, Jewish students, including Macky, are understandably frightened and fear for their safety.

103.    In the face of Columbia's inaction, Jewish students and news organizations took efforts to highlight the threats to student safety on campus. On October 30, 2023, Jewish students

held a press conference at Columbia's front gates slamming the administration's inaction to protect them. A survey of Jewish students by the Columbia Spectator three days later found that, of fifty surveyed students, "34 reported feeling unsafe on campus" and thirteen had "personally experienced incidents where they felt attacked or harassed."

104.    Yet, Columbia in general, and CSSW specifically, has ignored the pleas of its Jewish students and failed to adequately assure their safety and security.

105.    Through both their actions and inaction, administrators at Columbia and CSSW have emboldened those who harass, intimidate, and threaten their Jewish students.

106.    This failure to ensure the safety of Jewish students is further underscored by Columbia's failure to discipline students who participated in antisemitic attacks and harassment on its campus, despite its promises to do so. The House Committee on Education and the Work Force found in its investigation of campus antisemitism that Columbia imposed "shockingly few meaningful disciplinary consequences." At the end of the 2023-2024 school year, Columbia had suspended only four students and expelled none.

107.    The pro-Hamas and anti-Israel/antisemitic protests continue at Columbia today. Indeed, the House Committee on Education and the Workforce's "Antisemitism on College Campuses Exposed" report found that Columbia University was the site of some of the "most disturbing and extreme antisemitic conduct violations in the country."

108.    On or about November 1, 2023, the Office of the President of Columbia University (defendant Shafik), announced the creation of a new "Task Force on Antisemitism." https://president.columbia.edu/news/announcing-task-force-antisemitism    (accessed    on 10/30/2024 at 1:00pm)

109.    The announcement acknowledged that (i) the Taskforce was necessary "to ensuring that our campuses are safe, welcoming, and inclusive for Jewish students, faculty, and staff, and all of us" and (ii) "[w]e have been distressed that a series of antisemitic incidents on campus have been reported in the three weeks following the October 7 terror attack in Israel and outbreak of war in Gaza." *Id*.

110.    While Shafik correctly identified a real and present danger to Columbia's Jewish community, she failed to put in place the means necessary to protect Columbia's Jewish students.

111.    The Task Force published its second and final report on August 30, 2024,  too late to prevent the wave of antisemitism that Macky endured. While the report demonstrates Columbia's knowledge of the extent of antisemitism on campus, the Task Force is without meaningful power to act on its findings. Since the publication of the report, Columbia has failed to address the continuing antisemitic threats.

112.    After speaking with nearly 500 Jewish students, the Task Force found an epidemic of  "painful and distressing incidents of antisemitism" that required an "urgent need" for change. Jewish students repeatedly reported fears and anxieties about being recognizably Jewish on campus and having their fears dismissed or ignored by Columbia administrators. The findings of the report reveal that Columbia continues to be an unsafe place for Jewish students today.

113.    In addition to the findings of the Task Force's Report, Columbia's continued institutional culture of antisemitism is highlighted by revelations from the texts of high-level Columbia administrators, which were leaked in June of 2024. At an event on antisemitism on May 31, 2024, four Columbia deans exchanged text messages that mocked student concerns and were described by then-president Shafik as touching on "ancient antisemitic tropes." These texts reveal the depth of Columbia administrators' indifference and outright hostility towards Jewish students.

114.    Protecting Jewish students is simply not a goal for Columbia.

**VII.    FEARING FOR HER SAFETY ON CAMPUS IN LIGHT OF THE UNCHECKED AND VIOLENT DISPLAYS OF ANTISEMITISM THAT WERE PERMITTED TO FLOURISH ON COLUMBIA'S CAMPUS, MACKY REQUESTS PERMISSION TO ATTEND HER CLASSES REMOTELY, BUT HER REQUEST IS DENIED WITHOUT ANY LEGITIMATE JUSTIFICATION**

115.    Understandably, Macky, as an openly practicing Orthodox Jew, feared for her safety on Columbia's campus and did not feel safe attending her CSSW classes in person.

116.    Macky's fears were based on, among other things: (i) multiple Jewish students being physically and verbally assaulted and harassed on Columbia's campus; (ii) protesters blocking access to the Columbia campus and the CSSW building during unauthorized protests, sit-ins and teach-ins where incitements to violence against Jews were expressed; (iii) the posting of manifestoes calling for the destruction of Israel and the eradication of the Jewish people on the walls of the CSSW building; (iv) the statements of Columbia professor Shai Davidai that Columbia's campus was not safe for Jews; and (v) the refusal of Columbia and CSSW to take action to prevent violations of school policies meant to protect students.

117.    Thus, shortly after the events of October 7th and the explosion of antisemitism on Columbia's campus, Macky concluded that the only way to assure her safety would be for her to attend classes remotely via Zoom until Columbia was made safe for Jewish students.

118.    Macky first relayed her request to attend her classes remotely and safety fears during an October 19, 2023 Zoom meeting with Elizabeth Creel, her CSSW advisor.

119.    In her Zoom meeting with Ms. Creel, Macky mentioned the statement in the President of Columbia's October 18th e-mail that "special accommodations" were available to help students cope with the situation.  To that end, Macky raised the possibility of completing her coursework for the semester over Zoom, in light of Columbia's failure to make the campus safe for its Jewish students.

120.    In response, Macky was told that she "is the only person feeling unsafe" – even though Columbia's President had acknowledged the fear permeating Columbia's campus in her e-mail just the day before.

121.    Macky knew the statement that she "is the only person feeling unsafe" was false. Macky knew from in-person conversations, chats, and other social media outlets that other Jewish students also felt under siege and physically threatened at Columbia.  The Task Force has since confirmed that Macky was not alone in her fears, nor was she alone in the dismissive attitude with which administrators approached her concerns. The Task Force has detailed a pattern of "complaints not being taken seriously by administrators," as students were assured that what they had experienced "wasn't antisemitism." The Task Force has also described a "failure to listen" and "quick dismissal" by administrators, who told students they were alone in their complaints. Leaders on the Task Force have argued that this easy dismissal differs from how Columbia approaches complaints brought by other protected groups.

122.    In addition to dismissing Macky's concerns, Ms. Creel also told Macky that attending classes over Zoom was not an option.  Indeed, she chastised Macky for making such an "unreasonable request" and cruelly made a point of telling her that she would "not advocate" for any accommodation to be made, despite Macky not feeling safe on Columbia's campus.

123.    After the meeting, Macky felt dispirited and abandoned.  She also felt embarrassed by Ms. Creel's dismissal of Macky's safety concerns as unreasonable and unwarranted when Macky knew that other Jewish students shared her concerns.  She then sent an email to Ms. Creel stating:

> After reflecting upon our conversation I would appreciate it if you could keep what we said confidential. I will talk to [Dr. Ivanoff] in regards to what is best moving forward. Thank you[.]

124.    Ms. Creel responded to Macky's e-mail on October 21, 2023:

> Hope you are doing well.  I had already reached out to advising right after our conversation.  What I learned confirmed my assumptions. If you need to go home now, you will need to take a leave of absence.  Accommodations come in the form of extra time on papers and maybe tests.
> . . .
>
> Sometimes the situation in front of us seems overwhelming and impossible. But I believe that with support you will be able to achieve what you want. Perhaps your family can come visit you more often here in NYC for the next month or two (just a suggestion).  I'm open to brainstorming with you.

125.    Ms. Creel's e-mail confirmed to Macky that the reasonable and legitimate fears she had about her safety on Columbia's campus were being entirely ignored.

126.    Having Macky's family "come visit [her] more often" obviously did nothing to make the Columbia campus safer for Macky and other Jewish students.

127.    Macky's request was academically feasible.  Students in the DBT Program spend most of their time at clinical "field placements" not on Columbia's campus.  Moreover, Macky's desire to attend classes via Zoom only applied to the three courses on Tuesdays that she was taking on Columbia's campus.

128.    As discussed below, despite her repeated requests—and even though CSSW offers classes via Zoom—Macky was told that as a member of the DBT Program she was required to attend her classes in person on Columbia's campus.  If she did not attend her classes in person, she would fail the DBT Program and have to leave.

129.    CSSW did not allow Macky to attend classes online even though it had previously allowed other students to attend certain classes online.

130.    In fact, Columbia ultimately allowed all students to attend classes online on December 6, 2023, the day of a scheduled "teach-in" in support of Hamas.

131.    Similarly, Columbia later announced an all-remote option for students among continued protests in April of 2024.

132.    These accommodations were identical to the accommodation that Macky requested but was denied.

133.    Obviously, the option for attending classes online existed – CSSW simply refused to provide it to Macky despite her reasonable fears for her safety as a Jewish student.

134.    Moreover, while Macky was denied the opportunity to attend classes via Zoom, other non-Jewish students were offered and took advantage of the identical accommodation.

135.    On November 8, 2023, after Macky had told her mother "I'm afraid to go to class," Mrs. Forrest spoke to someone in the office of Dean of Students Affairs.  Mrs. Forrest's fears were confirmed when she was told that "it is absolutely not safe; if is she is on campus we will send security to get her."  Macky was not on campus at the time, so a security escort was not needed at that time.

136.    Over the course of the following days, Macky continued to raise her legitimate safety concerns with members of the CSSW administration and advising staff but was repeatedly told the same thing:  she was required to attend classes at CSSW in-person, and she would be given no accommodation to complete her semester online.

137.    In short, CSSW refused to make any accommodation to address Macky's reasonable fears for physical and psychological safety on campus.

138.    Worse yet, Macky faced retaliation for reporting the hostile environment for Jewish students on campus and raising safety concerns and was ultimately forced out of the DBT Program entirely.

VII.    **BECAUSE OF HER JEWISH IDENTITY AND IN RETALIATION FOR REPORTING THE HOSTILE ENVIRONMENT AND RAISING CONCERNS FOR HER SAFETY ON CAMPUS, MACKY IS FORCED OUT OF THE DBT PROGRAM**

139.    Not only did CSSW refuse to grant Macky's reasonable request for an accommodation to attend her classes remotely, it punished her for it.

140.    Beginning in late October 2023, Dr. Ivanoff, unwilling to accept or even acknowledge the legitimate concerns Macky had raised about her safety on Columbia's campus spearheaded a campaign to force Macky out of the DBT program entirely. Dr. Ivanoff's retaliatory campaign was motivated by a desire to punish Macky for daring to raise such safety concerns in the first instance and by the discriminatory animus she harbored against Macky due to her Jewish identity.

141.    The first signs of this campaign manifested in an October 27, 2023 email from Dr. Ivanoff to Macky, which raised—for the first time—"concern[s]" about Macky's "performance in the field at CCG." This email came just eight days after Macky had engaged in statutorily protected activity by raising her concerns about the violent antisemitism permeating Columbia's campus and the threat it posed to her safety to her CSSW advisor, Elizabeth Creel.

142.    Until this e-mail, no one had ever raised any concerns about Macky's performance with her. To the contrary, Macky maintained a perfect grade point average at CSSW and her internship was progressing nicely at CCG.

143.    Macky responded to Dr. Ivanoff's e-mail and wrote:

> Regarding my performance in field placement, I have been attending regular meetings with my supervisor, but no performance issues have been raised during these discussions. At the beginning of the semester, I took great care to outline all the field expectations and responsibilities in a concise document (attached here). I reviewed this document with Alexis, my supervisor, to ensure a clear understanding of my role during one of our first supervision sessions. Additional expectations were not discussed or have surfaced since the start of the

field placement. I have been following these expectations diligently since day one. As a result, I am confused about any unforeseen issues that may have arisen.

Thank you for your understanding and support. I look forward to resolving these matters and continuing to contribute to our shared goals.

144. Macky's alleged "performance issues" at CCG were also raised during other meetings with CSSW administrators at the very end of October 2023 – meetings which were ostensibly scheduled to respond to Macky's safety concerns.

145. Worse still, in late October 2023, Macky was informed for the first time that she was at risk of receiving a failing grade for her field placement. Prior to this, there was never any indication that Macky was not meeting expectations in—let alone at risk of failing—her field placement. Macky had been receiving straight As, and in her weekly meetings with her supervisor, she was never told that she was not meeting expectations. Receiving a failing grade in her field placement would mean Macky would not only be unable to continue in the DBT Program, but also would face the adverse career effects of a failing grade on her Columbia transcript.

146. Again, none of these alleged "performance issues" had ever been previously raised with Macky, and indeed, they were patently untrue. They were raised simply as a pretext to force her out of the DBT Program.

147. For example, CSSW administrators asserted that Macky was only seeing one DBT client and was declining to take on new clients. While it was true that Macky had one DBT client, it had never been communicated to her that there was a minimum or maximum number of DBT clients that she was expected to see. To the contrary, Macky had gone over the expectations with Ms. Santiago-Autar and those expectations did not include a specific minimum requirement of DBT clients.

148. In any event, at no time did Macky decline to take on additional clients.

149.    Nonetheless, the DBT Program used these alleged "performance issues" as a cudgel to force Macky out of the DBT Program.  In early November 2023, Macky was told that she was going to receive a failing grade for her field placement.  However, she was also told that if she was willing to drop out of the DBT Program, she would be allowed to withdraw from the field placement and no grade would be recorded on her transcript.

150.    Thus, Macky was faced with a Hobson's choice: drop out of the DBT Program or receive a failing grade in her field placement.

151.    The fact that Macky's alleged "performance issues" were first raised shortly before the CSSW deadline to withdraw from a class only exacerbated the issue and did not give Macky adequate time to try to address any concerns about her performance – pretextual as they might be.

152.    Because she did not want to have a failing grade on her record, and because it was obvious that she would be failed if she continued in the DBT Program, Macky had no other choice but to withdraw from the DBT Program.

153.    Between: (i) Dr. Ivanoff's resistance and open hostility when Macky outed herself as a Jew and raised her need for Sabbath accommodation, (ii) the faculty's refusal to allow Macky to take classes via Zoom after the spike in antisemitism on campus and her fearing for her safety, (iii) the slew of newly concocted pretexts that Macky was not meeting program requirements, (iv) the threat that if Macky stayed in the program she would be failed, and (v) the requirement that Macky – and only Macky – provide a 100% commitment to attending classes in person despite her reasonable concerns for her physical safety, Macky got the message loud and clear. CSSW and Dr. Ivanoff intended to force her out of the DBT Program.

154.    Macky was faced with another Hobson's choice of continuing in the DBT Program and putting her physical and psychological safety at risk, or switching to a different field of study that she could pursue through online coursework.

155.    Macky was only faced with this impossible choice because of Columbia's failure to take the necessary steps to provide a safe campus environment for Macky and its other Jewish students.

156.    Not surprisingly, Dr. Ivanoff's blatant disregard for the safety and wellbeing of Columbia's Jewish students continued after Macky was forced out of the DBT program.  In the face of a congressional investigation into antisemitism at Columbia, Dr. Ivanoff signed a letter which downplayed the experiences of Jewish students and dismissed claims of widespread antisemitism as "absurd."

157.    During Macky's communications with her advisors about potential accommodations, she repeatedly reiterated her desire to stay in the DBT Program, albeit in a way that ensured her physical safety.

158.    Despite this, until the very end, CSSW administrators tried to characterize Macky's withdrawal from the DBT Program as her choice – even though in reality, it was anything but.

159.    For example, in a November 16, 2023 e-mail, the CSSW Director of Advising, Yesika Montoya, stated that "[a]s a result of the feedback shared with all parties, it was agreed that Mackenzie is no longer continuing in the DBT program . . ."

160.    Macky responded to that e-mail and made it clear that it was quite the opposite:

> Thank you for your email. Unfortunately this is not consistent with what occurred at the meeting. I was told if I stayed in the program I would be failed or that I had to leave. This is not what I wanted to do. Your email implies that we came to an amicable agreement on how to best proceed, but we did not.
>
> Since I still would like to be a DBT clinician, I have been forced out of my specialization of choice in order to avoid giving up graduation. What is most

troubling about this is I believe I am being punished for being an observant Jew who is concerned for her safety.

161.    Simply put, Macky has been victimized by Defendants because she is Jewish and in retaliation for raising safety concerns posed by the violent and unchecked antisemitism running rampant on Columbia's campus.

162.    Since graduating from CSSW, and as a direct result of being forced out of the DBT program, Macky has been unable to secure employment as a DBT practitioner. After being unemployed for several months, Macky was forced to accept a non-DBT practitioner position at a significantly lower salary.

## VIII.    COLUMBIA FAILS TO ENFORCE ITS OWN RULES OF CONDUCT

163.    Columbia has numerous written policies, publications, rules, regulations, codes, and procedures that are allegedly intended to protect Jewish students, such as Macky, from specifically anti-Jewish discrimination, harassment, threats, intimidation, and hostile environments.

164.    These written documents form a part of the contractual relationship between Macky and Columbia.

165.    Columbia's Statement of Ethical Conduct applies to "all officers of instruction, research, libraries, athletics, and administration; support staff; and students."

166.    The Statement's "basic principles" requires those people to *inter alia*, "[o]bey the law" and "[f]ollow University policies and procedures."

https://universitypolicies.columbia.edu/content/statement-ethical-conduct-and-administrative-code-conduct (accessed 1/17/2024 at 4:51 pm)

167.    The Statement further provides that "[a]n individual's failure to live up to these principles may result in disciplinary action, including suspension, termination, and monetary fines

consistent with University policy. For violations of applicable laws, individuals may also face criminal and civil penalties, including monetary penalties." *Id*.

168.    As became abundantly clear to Macky, Columbia's Statement of Ethical Conduct did little or nothing to protect Columbia's Jewish students.

169.    Columbia's Rules of University Conduct are found in Chapter XLIV of the Statutes of Columbia University.

https://universitypolicies.columbia.edu/content/rules-university-conduct

(accessed 1/17/2024 at 5:21 pm)

170.    "The Rules of University Conduct shall apply to all members of the University community: administrators, administrative staff, research staff, library staff, supporting staff, faculty, and students." *Id*., § 442. Jurisdiction.

171.    "The Rules of University Conduct apply to any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity. Such facilities include, but are not limited to, all University campuses, research laboratories, maintenance shops, business offices, athletic fields, dormitories, classrooms, and meeting halls." *Id*., § 442. Jurisdiction.

172.    Section 443(a) states that

[a] person is in violation of these Rules when such person individually or with a group, incident to a demonstration, including a rally or picketing:

(1) (simple violation) engages in conduct that places another in danger of bodily harm;
(2) (serious violation) causes or clearly attempts to cause physical injury to another person;
(3) (simple) uses words that threaten bodily harm in a situation where there is clear and present danger of such bodily harm;
(4) (serious) uses words in a situation of clear and present danger that actually incite others to behavior that would violate Sections 443a (2) or (6);
(5) (simple) causes minor property damage or loss, or endangers property on a University facility;

32

(6) (serious) misappropriates, damages, or destroys books or scholarly material or any other property belonging to the University, or to another party, when that property is in or on a Uni-versity facility, and by such action causes or threatens substantial educational, administrative, or financial loss;

(7) (simple) interferes over a short period of time with entrance to, exit from, passage within, or use of, a University facility but does not substantially disrupt any University function;

(8) (serious) continues for more than a very short period of time to physically prevent, or clearly attempt to prevent, passage within, or unimpeded use of, a University facility, and thereby interferes with the normal conduct of a University function;

(9) (serious) enters or remains in a University facility without authorization at a time after the facility has been declared closed by the University; (Comment: The University shall make all reasonable attempts to publicize this declaration to the fullest extent possible.)

(10) [omitted];

(11) [omitted]

(12) (simple) causes a noise that substantially hinders others in their normal academic activities;

(13) (simple) briefly interrupts a University function;

(14) (serious) disrupts a University function or renders its continuation impossible.

173.    Columbia's Rules of University Conduct did little or nothing to protect Columbia's Jewish students, including Macky.

174.    The "protections" contained in the Rules of Conduct are effectively nullified by Columbia's refusal to deploy them in the protection of Jewish students.

175.    As a result, Jewish students are deprived of the protections Columbia vigorously enforces on behalf of other protected groups.

176.    At Columbia, the Jews are on their own.

## COUNT I
(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.)
(DIRECT DISCRIMINATION)
(All Defendants)

177.    Plaintiff repeats all the allegations set forth in the paragraphs above.

178.    Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d, provides as follows:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

179.    Columbia receives Federal financial assistance, including assistance from the U.S. Department of Education.

180.    The DBT Master's Program at CSSW is a program or activity under Title VI.

181.    Title VI of the Civil Rights Act of 1964 applies to Columbia, including CSSW.

182.    Title VI, as interpreted by the courts and by the Office of Civil Rights of the U.S. Department of Education, prohibits discrimination based on religion if it is part of a student's actual or perceived shared ancestry or ethnicity, including discrimination against Jewish students, such as Macky.

183.    Title VI prohibits Columbia from discriminating against Macky on the basis of her Jewish shared ancestry or ethnicity.

184.    Defendants' conduct, as alleged in detail above, denied Macky the benefits of, and subjected Macky to discrimination in, the DBT Program at CSSW.

185.    Defendants' conduct, as alleged in detail above, constitutes discrimination against Macky on the basis of her Jewish shared ancestry and ethnicity.

186.    Defendants' conduct, as alleged in detail above, constitutes a violation of Title VI.

187.    Defendants violated Title VI by directly and intentionally discriminating against Macky based on her shared ethnic and ancestral heritage.

188.    As a direct result of her Jewish ethnicity and ancestry, Macky was subjected by discrimination by Defendants and suffered adverse actions.

189.    Specifically, Defendants engaged in a campaign spearheaded by Dr. Ivanoff—someone Columbia knew had exhibited discriminatory animus towards Jewish students and had

openly expressed her desire to avoid admitting observant Jewish students into the DBT Program—
to force Macky out of the DBT program.

190.    The campaign by Defendants to force Macky out of the DBT program directly and
intentionally discriminated against Macky on the basis of her Jewish identity.

191.    The Defendants' discrimination deprived Macky of equal access to educational
opportunities and benefits provided to other students at Columbia. As a result of the discrimination
she faced, Macky was unable to obtain her DBT specialization, thus depriving her of the ability to
successfully obtain employment as a DBT practitioner, a career path that she had specifically
attended CSSW to pursue and that she had worked towards for several years.

192.    Despite Columbia's Equal Opportunity and Affirmative Action (EOAA) office
determination that Dr. Ivanoff had engaged in discriminatory harassment in her role as director of
the DBT program, Columbia allowed Dr. Ivanoff to return to her role, which allowed her to
continue to discriminate against Jewish students, including Macky.

193.    Columbia had actual knowledge that Dr. Ivanoff had been found by the school's
own investigation to have harbored discriminatory animus towards Jewish students.

194.    Defendants had substantial control over and the authority to remediate antisemitic
discrimination on Columbia's campus, including the discriminatory acts of Dr. Ivanoff. However,
they failed to cure or otherwise appropriately address the issue, and instead actively aided Dr.
Ivanoff in her efforts to drive Macky out of the DBT program.

195.    As a direct and proximate result of Defendants' actions and inactions, Macky was
deprived of access to educational opportunities and benefits, including the ability to receive an
education in an environment free from discrimination and intimidation, the ability to freely and
fully participate in all classes and campus activities without fear of discrimination and retaliation,

the ability to complete her DBT specialty program, and the ability to compete for job opportunities in her chosen field.

196.    By reason of the foregoing, Plaintiff is entitled money damages, in an amount to be determined at trial.

197.    Plaintiff is also entitled to her attorney's fees and expenses under 42 U.S.C. § 1988.

<u>**COUNT II**</u>
(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)
(HOSTILE EDUCATIONAL ENVIRONMENT)
(All Defendants)

198.    Plaintiff repeats all the allegations set forth in the paragraphs above.

199.    The U.S. Department of Education Office of Civil Rights ("OCR") has stated that: "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment."[4]

200.    The OCR has also noted that it "could find a Title VI violation in its enforcement work if: (1) a hostile environment based on race existed; (2) the school had actual or constructive notice of the hostile environment; and (3) the school failed to take prompt and effective steps reasonably calculated to (i) end the harassment, (ii) eliminate any hostile environment and its effects, and (iii) prevent the harassment from recurring."[5]

201.    Macky is of Jewish ethnicity and ancestry, and therefore is a member of a protected class within the scope of Title VI's protections.

202.    As a direct result of her Jewish ethnicity and ancestry, Macky has faced harassment and been subjected to a hostile educational environment. Defendants had actual knowledge of and

---

[4] See Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ..to Colleague at 1 (May 25, 2023), https://www.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf.

[5] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ..to Colleague at 4 (August 24, 2023), https://www.ed.gov/about/offices/list/ocr/letters/colleague-20230824.pdf.

substantial control over these incidents of harassment to which Macky was subjected yet remained deliberately indifferent to them because their response to her reports were either inadequate, delayed, or non-existent.

203.    The harassment was so severe and objectively offensive that it deprived Macky of access to educational benefits and opportunities provided by Columbia.

204.    As a direct and proximate result of Defendants' actions and inactions, Macky was deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from harassment and intimidation, and the ability to freely participate in all classes and campus activities without fear of harassment and intimidation.

205.    Specifically, the on-campus harassment to which Macky was subjected because of her Jewish ancestry and ethnicity was frequent, and at times confrontational and physically violent. Macky legitimately feared the repetition of such harassment, and the harassment she suffered negatively impacted her life and experience at Columbia. Macky dreaded walking through campus, feared attending her classes in person, and feared taking advantage of Columbia's religious accommodation policies lest she again become the subject of Dr. Ivanoff's hostile and discriminatory behavior.

206.    By reason of the foregoing, Plaintiff is entitled money damages, in an amount to be determined at trial.

207.    Plaintiff is also entitled to her attorney's fees and expenses under 42 U.S.C. § 1988.

## COUNT III
(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.)
(RETALIATION)
(All Defendants)

208.    Plaintiff repeats all the allegations set forth in the paragraphs above.

209.    The Department of Education regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. §100.7(e).

210.    That regulation applies once a "student…or other individual complains formally or informally to a school about a potential civil rights violation" and aims to ensure that "individuals [are] commended when they raise concerns about compliance with Federal civil rights laws, not punished for doing so."[6]

211.    Macky is of Jewish ethnicity and ancestry and, therefore, is a member of a protected class within the scope of Title VI's protections.

212.    Macky engaged in protected activity when she reported the violent nature of the discrimination and harassment directed towards Jewish students on Columbia's campus and her concerns for her physical and emotional safety on campus as a result.

213.    Defendants subjected Macky to material adverse actions as a result of, and shortly after, her engagement in the protected activity of reporting discrimination and harassment at Columbia.

214.    Specifically, just eight days after Macky first raised her concerns regarding her safety on campus due to the rampant antisemitism with her CSSW advisor, Defendants began their campaign, spearheaded by Dr. Ivanoff, to force Macky out of the DBT program.

---

[6] Letter from Seth M. Galanter, Acting Assitant Sec'y for Civil Rts., U.S. Dep't of Educ. To Colleague at 1 (Apr. 24, 2013), https://www.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf.

215.    As a direct and proximate result of Defendants' actions and inactions, Macky was deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from retaliation, the ability to participate in all classes and campus activities freely and fully without fear of retaliation, the ability to complete her DBT specialty program, and the ability to compete for job opportunities in her chosen field.

216.    By reason of the foregoing, Plaintiff is entitled money damages, in an amount to be determined at trial.

217.    Plaintiff is also entitled to her attorney's fees and expenses under 42 U.S.C. § 1988.

### COUNT IV
(New York Executive Law (Human Rights) § 296 *et seq*.)
(All Defendants)

217.    Plaintiff repeats all the allegations set forth in the paragraphs above.

218.    N.Y. Exec. Law § 296(4) says, in pertinent part, as follows:

> It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, age, marital status, or status as a victim of domestic violence, except that any such institution which establishes or maintains a policy of educating persons of one sex exclusively may admit students of only one sex.

219.    Plaintiff is a person protected by § 296.

220.    Columbia, including CSSW, is an "educational institution" under § 296.

221.    Section 296 prohibits discrimination against Jewish people, such as Plaintiff, on the basis of their actual or perceived religion, race and/or color.

222.    Section 296 applies to defendant Columbia, including CSSW.

223.    Defendants' conduct, as alleged in detail above, constitutes a "den[ial of] the use of its facilities" to Plaintiff under § 296.

224.    Defendants' conduct, as alleged in detail above, constitutes a violation of § 296.

225.    By reason of the foregoing, Plaintiff is entitled to money damages, including treble and/or punitive damages, in an amount to be determined at trial.

226.    Plaintiff is also entitled to her attorney's fees and expenses under N.Y. Executive Law § 297(10).

## COUNT V
(New York Civil Rights Law§ 40-c)
(All Defendants)

227.    Plaintiff repeats all the allegations set forth in the paragraphs above.

228.    N.Y. Exec. Law § 291(2) provides as follows:

The opportunity to obtain education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space without discrimination because of age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, marital status, or disability, as specified in section two hundred ninety-six of this article, is hereby recognized as and declared to be a civil right.

229.    N.Y. Civ. Rights Law § 40-c provides as follows:

1.    All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2.    No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

230.    Section 40-c applies to defendant Columbia, including CSSW.

231.    Defendants' conduct, as alleged in detail above, constitutes "discrimination in [Plaintiff's] civil rights" under N.Y. Civ. Rights Law § 40-c, in connection with her "opportunity to obtain education," a civil right under N.Y. Exec. Law § 291(2).

232.    Defendants' conduct, as alleged in detail above, constitutes a violation of N.Y. Civ. Rights Law § 40-c.

233.    Plaintiff has given notice to the N.Y. State Attorney General before the commencement of this action by serving a copy of this Complaint, as required by N.Y. Civ. Rights Law § 40-d.

234.    By reason of the foregoing, Plaintiff is entitled to money damages, including treble and/or punitive damages, in an amount to be determined at trial.

## COUNT VI
(Breach of Contract)
(Defendant Columbia)

235.    Plaintiff repeats all the allegations set forth in the paragraphs above.

236.    At all times relevant to this complaint, an express and/or implied contract relationship existed between Macky and Columbia by virtue of her status as an enrolled, matriculated graduate student in a Master's program at CSSW.

237.    The terms of the contractual relationship are contained in the various documents executed by Macky and in the various publications, rules, regulations, codes, and procedures issued by Columbia (collectively, the "Agreement").

238.    Under the express and implied terms of the Agreement, Columbia was obligated to take reasonable measures to (i) prevent discrimination by the Columbia "community" as defined in Rules of University Conduct § 442, against Macky based on her Jewish identity, (ii)  protect Macky from harm, threats, and harassment and to provide a safe environment for her education, studies, and school work on the Columbia campus and in surrounding areas controlled or operated by Columbia and (iii) accommodate  legitimate concerns for Macky's safety.

239.    As detailed in the allegations above, defendant Columbia, including CSSW, breached its Agreement with Macky.

240. To the extent not explicitly provided for in the Agreement, Defendant Columbia breached the implied covenant of good faith and fair dealing in the Agreement by not extending the same level of protection to Jewish students, such as Macky, that it extended to members of other actual of perceived religious, racial, ethnic, groups.

241. By reason of the foregoing, Macky is entitled to money damages in an amount to established at trial for breach of contract.

## COUNT VII
(New York General Business Law §§ 349, 350)
(Defendant Columbia)

242. Plaintiff repeats all the allegations set forth in the paragraphs above.

243. N.Y. Gen. Bus. Law § 349 provides in pertinent part as follows:

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

* * *

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

244. N.Y. Gen. Bus. Law § 350 provides as follows:

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

245. Sections 349 and 350 apply to defendant Columbia, including CSSW.

246. Defendant Columbia made representations, statements, and promises to induce Macky to believe that Columbia would take reasonable steps to protect her from, and to prevent the occurrence of, situations where she would experience reasonable fear of abuse, harassment and

physical harm from the "community" as defined in Rules of University Conduct §442, during the time Macky is a student at CSSW.

247.    Defendant Columbia made representations, statements, and promises to induce Macky to believe that Columbia would take reasonable steps to protect her from, and to prevent the occurrence of, situations where she would experience discrimination and hostility from the Columbia community, on account of her Jewish identity.

248.    Defendant Columbia's representations, statements, and promises, as detailed in the preceding paragraphs of this complaint, were deceptive and false because Columbia, including CSSW, did not and does not protect Jewish students such as Macky from harassment and intimidation and did and does not accord Jewish students the same level of accommodation and protection that it accords non-Jewish students.

249.    Defendant Columbia's conduct, as alleged in detail above, constitutes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

250.    Defendant Columbia's conduct, as alleged in detail above, constitutes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

251.    Defendant Columbia's conduct, as alleged in detail above, constitutes a violation of sections 349 and 350.

252.    Macky's decision to enroll in the Master's program at CSSW was motivated in part by her reliance on Defendant Columbia's conduct as detailed above.

253.    By reason of the foregoing, Macky is entitled to actual and treble damages in an amount to be established at trial.

254.    Plaintiff is entitled to attorneys' fees and costs pursuant to N.Y. General Business Law § 349(h).

## **JURY DEMAND**

255.    Plaintiff hereby demands a trial by jury for all applicable issues and claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays and demands that a judgment be entered in her favor, and against Defendants awarding her relief as follows:

A. Damages, including treble damages and/or punitive damages, as provided by law, in amounts to be determined at trial;

B. Reasonable attorneys' fees, costs of suit, and expenses;

C. Interest as provided by the law; and

D. Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        November 11, 2024

WILLKIE FARR & GALLAGHER LLP


By: */s/ Jill K. Grant*
Jill K. Grant
787 Seventh Avenue
New York, New York 10019
(212) 728-8774
jgrant@willkie.com
*Co-counsel for Plaintiff*

*-and-*

THE LAWFARE PROJECT LLP

By: */s/ Ziporah Reich*
Ziporah Reich
633 Third Avenue, 21st Floor
New York, NY 10017
 (212) 339-6995
 Ziporah@TheLawfareProject.org
*Co-counsel for Plaintiff*